Jacquelyn ANSCHUTZ, Plaintiff,

v.

Jo Anne B. BARNHART[1],
Commissioner of Social
Security, Defendant.

No. 4:01–CV–90554.

United States District Court,
S.D. Iowa,
Central Division.

July 26, 2002.

---

1. Jo Anne B. Barnhart became the Commissioner of Social Security on November 9, 2001. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure [Rule 43(c)(2) of the Federal Rules of Appellate Procedure], Jo Anne B. Barnhart should be substituted, therefore, for Acting Commissioner Larry G. Massanari as the defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

Ruth M. Carter, Sioux City, IA, for Plaintiff.

Gary L. Hayward, Asst U.S. Atty, Des Moines, IA, for Defendant.

## ORDER

PRATT, District Judge.

Plaintiff, Jacquelyn Anschutz, filed a Complaint in this Court on September 17, 2001, seeking review of the Commissioner's decision to deny her claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed and remanded for further administrative procedures.

## BACKGROUND

Plaintiff filed applications for Social Security Disability Benefits on October 22, 1997, claiming to be disabled since September 2, 1995. Tr. at 184–87 & 473–80. Plaintiff was last insured for Title II benefits at the end of December 1999. Tr. at 197.

After the applications were denied, initially and on reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held

before Administrative Law Judge Cheryl M. Rini (ALJ) on March 24, 1999, in Omaha, Nebraska. Tr. at 41–153. The ALJ issued a Notice Of Decision—Unfavorable on November 22, 1999. Tr. at 15–39. After the decision was affirmed by the Appeals Council on August 4, 2001 (Tr. at 10–11), Plaintiff filed a Complaint in this Court on September 17, 2001.

## MEDICAL RECORDS

The ALJ found that Plaintiff has the following severe impairments: psoriasis, verruca plantaris (plantar warts) and a bipolar disorder. Tr. at 32.

Plaintiff was hospitalized at the Mental Health Institute in Cherokee, Iowa from October 18, 1995 until November 2, 1995. Tr. at 375–85. Plaintiff was hospitalized because she had threatened to hurt herself in order to keep people from leaving her. During the hospital stay, Plaintiff was closely observed and supervised by the skilled mental health professionals. The discharge diagnoses were dysthymia on Axis I, and on Axis II borderline dependent traits. On Axis V, Plaintiff was given a global assessment of functioning (GAF) of 90. Tr. at 377.

Plaintiff was treated at the University of Iowa Hospitals and Clinics for psoriasis and plantar warts on February 5, 1996. Plaintiff had scattered erythematous psoriatic plaques on all of her extremities. On the knees and back of the legs, there was plaque with very thick scale. The plantar surfaces of both feet had "numerous verrucous papules with interrupted dermatoglyphics and thrombosed capillaries." Plaintiff was given prescription ointments for the psoriasis. Six warts were removed from her feet, and she was instructed on home treatment. Tr. at 387.

On November 21, 1995, Plaintiff met with a counselor from the Iowa Department of Vocational Rehabilitation to which she had been referred at the time of her discharge from the Mental Health Institute. Plaintiff reported that she required services because of dysthymia and borderline personality disorder. She said that when she experiences severe depression she finds it very difficult to care for herself. Because of her illnesses, she said, she misses a great deal of work and jumps from job to job. Along with depression, Plaintiff said she experiences intense rage at which time she becomes very angry and physically violent. In addition, Plaintiff said that she has learning disabilities in reading, written language and math. She said that she had been involved in special education classes throughout her schooling. Tr. at 394. Plaintiff said that her mental problems interfere with her ability to maintain interest in work and that her physical problems consist of kidney infections which occur approximately twice a month and which cause her to miss work. Tr. at 395. The counselor noted that Plaintiff had a great deal of experience working in restaurants as a bartender, waitress, cook, and cashier, but that Plaintiff did not enjoy that type of work. Furthermore, Plaintiff stated that she had held so many jobs in the past which she lost because of being sick, she was of the opinion that it would be difficult for her to be hired because of a lack of references. Tr. at 396. In a note dated December 4, 1995, the counselor wrote that Plaintiff was not eligible for services because she requires "accommodations not typically made for others to maintain a stable job performance." The counselor also wrote: "She requires accommodations not typically made for others to meet the essential strength, stamina and endurance requirements needed to deal with psychological demands on the job. The client is limited in the functional area of interpersonal skills in that she exhibits emotional behaviors which interfere with the performance

of others and the client in work settings." Tr. at 392.

Plaintiff saw Barbara D. Chaplik, Ph.D. for a psychological evaluation on January 30, 1998. Tr. at 397–99. The psychologist wrote that it was "very obvious that this client has serious psoriasis." The hands and fingers were deeply scarred and breaks in the skin were observed. Plaintiff said that both liquids and chemicals irritate the skin and that because perspiration causes soreness, she cannot wear rubber gloves for chores. Tr. at 397. On the Wechsler Adult Intelligence Scale—3rd Ed., Plaintiff scored a verbal IQ of 82, a performance IQ of 91, and a Full Scale IQ of 85. Tr. at 398. The psychologist wrote that although there was a significant difference between the verbal and performance IQ scores, "[s]he is definitely not mentally handicapped by low intellectual ability." Dr. Chaplik concluded her report by stating that although Plaintiff's ability to interact with co-workers, supervisors, and the public is problematic due to the appearance of her hands and arms, that she is able to understand, remember, and carry out instructions and that she is able to maintain attention, concentration and pace. Tr. at 399.

Plaintiff was seen by Thomas Babcock, D.O., a doctor at McFarland Clinic, for a physical examination on February 4, 1998. Dr. Babcock wrote that he examined Plaintiff for psoriasis, corns and warts, and kidney infections. The doctor was aware of the type of treatment that Plaintiff had received at the University of Iowa. Plaintiff was unable to continue the medication Dovonex, because of the cost of $100.00 a tube. Other treatments such as soaking or various creams caused extreme pain. Tr. at 400. Plaintiff reported that she had surgery on her kidneys in 1975 to correct a duplicated left kidney and ureter. She said that she has been treated at the University of Iowa for recurrent urinary infections. Tr. at 401. The doctor noted extensive plaques on Plaintiff's hands, elbows, knees, feet, ankles, arms and legs. On the hands and ankles, there was cracking which he described as long fissures. The doctor did not see any joint swelling. Tr. at 402. Dr. Becker wrote:

Certainly Ms. Anschutz has severe psoriasis, that would benefit from treatment. Treatment in her situation appears to be very difficult because of her intolerance of some of the topical remedies such as soaking and salicylic acid and difficulties in arranging some of the other types of treatment such as phototherapy. Phototherapy would be available to her in clinics, but these clinics are in Des Moines and would require traveling to Des Moines four or five times a week for treatment. The treatments with topical steroids such as Dovonex certainly would be a possibility, but she might have to arrange alternate sources of the medication if she can't afford to pay for it. It might be possible for her to work with a dermatologist and work with a drug company to try to get medication provided free of charge. There are some other treatments for psoriasis that can be used. Sometimes psoriasis is related to Streptococcal infections, and treatment with Penicillin may be effective. There are other treatments that have been outlined in dermatology textbooks that the patient has not tired. Any treatment, however, would require her to be able to either pay for the medication or be provided samples of the medication, or have proximity to the phototherapy.

Tr. at 403. Dr. Babcock said that the plantar warts could be treated with shave excision and application of chemical desiccants but that the treatment would need to be continuous and ongoing. Tr. at 403–04. Dr. Babcock opined that lifting and carrying would be difficult because of the crack-

ing and fissures on Plaintiff's hands, but he also said that handling objects would not necessarily be difficult.

Plaintiff was treated at The Richmond Center Community Mental Health Services from December 5, 1995 through May 28, 1998 (Tr. at 430). Tr. at 430–60. The notes indicate that Plaintiff was treated with a variety of medication for chronic depression.

Between December 8, 1998 and March 18, 1999, Plaintiff was treated at Miller Chiropractic Center. Tr. at 462–70. Plaintiff reported that on November 17, 1998 she had been injured while a passenger in a car that was hit by another car. Tr. at 467. Plaintiff complained of stiff neck, sore upper back and headaches. Tr. at 469.

## ADMINISTRATIVE HEARING

Plaintiff appeared and testified at a hearing on March 24, 1999. Tr. at 41–153. Plaintiff testified that the last time she had used any medication or had seen a doctor for her psoriasis was in January of 1998. She said that all of the medication she had been given was painful and did not work, so she stopped seeking treatment. Tr. at 66. Plaintiff also said that the cost of the medication was prohibitive. Tr. at 67. Plaintiff said that she sees the psychiatrist at the Richmond Center once a month and that she sees the chiropractor twice a week. Tr. at 69.

Plaintiff testified that she was in her sixth year of having psoriasis, and that although the condition was somewhat less severe in the summer, she had sores on her arms and legs all the time. Tr. at 78. Plaintiff said that medication would work for short periods of time, but that after a while it would quit working and would burn when applied to her skin. Tr. at 79–80. When asked about using her hands, Plaintiff said that she could grasp a pen to sign her name, but that if she used it for a prolonged period of time, her hands would bleed because of the stretching of her fingers. Tr. at 81.

Plaintiff was asked how her mental problems affect her ability to work. She responded that her concentration is not "so great." She said that because of her temper, people find it difficult to work around her. She said that the medication helps but that she still has crying and anger spells. Tr. at 83.

When she was asked how much weight she can lift, Plaintiff responded that if she lifts a gallon of milk, the skin on her hands splits. She said that she is left handed. Tr. at 90. Plaintiff said that because of the warts on her feet, she can stand and/or walk for less than a half hour at a time. Tr. at 91. She said that she thought that the total amount of time that she could be on her feet during a work day would be two hours. Plaintiff said she can sit for two hours at a time. Tr. at 92.

After Plaintiff testified, the ALJ called David Utley to testify as a vocational expert. Tr. at 102. After a lengthy discussion between the ALJ, the vocational expert, and Plaintiff's counsel regarding transferable skills (Tr. at 104–125), the ALJ asked the vocational expert the following hypothetical:

I want you to assume an individual with the same vocational profile as the claimant but for the moment to disregard her testimony. Assume an individual who can lift or carry 20 pounds occasionally, ten pounds frequently. Can stand or walk at least six hours in an eight-hour day with normal breaks meaning every two hours. Can sit for at least six hours in an eight-hour day with normal breaks, again meaning about every two hours. This individual has no push or pull limitations but can only occasionally climb stairs, kneel, crouch and crawl, but can perform balancing and stooping on a

frequent basis .... [use] ladders, ropes and scaffolds ... only on an occasional basis ... She cannot perform tasks requiring emersion of the hands in water or under running water, but has no other manipulative limitations. Has no visual or communicative limitations but must avoid concentrated exposure to extreme heat, but has no other environmental limitations. Could this individual return to any of the past work of the claimant or perform any other work in the national economy.

Tr. at 125–26. In response, the vocational expert testified that such an individual could perform Plaintiff's past work of waitress, bartender, nurse assistant and cashier/checker, as described in the Dictionary of Occupational Titles. Tr. at 126–27. In the second hypothetical, the ALJ added to the first question that the individual cannot perform the application of or use of cleaning materials or agents with either hand and that the individual can work with members of the general public only on an occasional basis in face to face transactions. Tr. at 127. In response, the vocational expert testified that such an individual would not be able to do any of Plaintiff's past work but that there would be unskilled sedentary jobs such as laborers except for construction labor and assembler jobs that could be done under the hypothetical. Tr. at 128. Throughout his testimony, the vocational expert made it clear that he was not referring to specific jobs listed in the Dictionary of Occupational Titles (DOT). Rather, he was using Department of Labor statistics and census codes. While being cross examined, the vocational expert said: "Well, let me clarify. There are within that category of jobs there are jobs that are unskilled, require limited education, marginal education, as well as there are jobs that, let's see, that category of jobs includes jobs that require prior experience in vocational training as well as advanced education. The numbers

that I referred to apply to jobs that are sedentary, unskilled and sedentary, low level semiskilled jobs." Tr. at 132. He went on to testify: "Well, what I'm saying is that a category of jobs is going to contain a number of individual job titles. The *Dictionary of Occupational Titles* has jobs classified by a particular job title and definition. You're asking me to go from a specific to general or, you know, and I can't, I can't testify as to what all job titles are included in the category of bookkeepers, accounting and auditing clerks. It's a category of jobs defined by the Department of Labor.... And I'm not sure what all the job titles are." Tr. at 132–33.

As a third hypothetical, the vocational expert was asked to add to the previous questions that the individual is precluded from understanding, remembering or carrying out complex or detailed instructions, but is able to understand, remember and carry out simple instructions in one to two-step procedures. The individual can use judgment and can respond appropriately to supervision, coworkers and the usual work situations and can deal with changes in a routine work setting. The hypothetical also assumed that the individual can type, use a cash register and use a computer keyboard. Tr. at 129–30. The vocational expert said that his response to the second hypothetical would still be applicable. Finally the vocational expert was asked to reduce the lifting limitation to ten pounds occasionally and small objects frequently. Again the vocational expert said his testimony was the same as in response to the second hypothetical. Tr. at 130.

## ADMINISTRATIVE DECISION

In the decision dated November 22, 1999, following the sequential evaluation set out in the regulations, the ALJ found that Plaintiff had not engaged in substantial gainful activity at any time pertinent to

the decision. The ALJ found that Plaintiff's severe impairments are psoriasis, verruca plantaris and a bipolar disorder. Tr. at 32. The ALJ found that Plaintiff's impairments do not meet or equal any listed in Appendix 1 to Subpart P of the Social Security Administration's Regulations No. 4. The ALJ found that Plaintiff is not able do her past relevant work due to her severe impairments but that she has a residual functional capacity consistent with the limitations presented to the vocational expert at the hearing including the limitation on lifting no more than ten pounds. Tr. at 33. The ALJ found that Plaintiff is able to do the type of work identified by the vocational expert. The ALJ found that Plaintiff is not disabled and is not eligible for the benefits for which she applied. Tr. at 34.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents

the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

█ In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir. 1975).

█ The ALJ found that Plaintiff is unable to do her past relevant work. The burden of proof, therefore, shifted to the Commissioner to prove with medical evidence that Plaintiff has a residual functional capacity to perform other work and that other work exists in significant numbers in the national economy that the claimant can perform. *Nevland v. Apfel,* 204 F.3d 853, 857 (8th Cir.2000) citing *McCoy v. Schweiker,* 683 F.2d 1138, 1146–47 (8th Cir.1982)(en banc), and *O'Leary v. Schweiker,* 710 F.2d 1334, 1338 (8th Cir. 1983). *See also Cunningham v. Apfel,* 222 F.3d 496, 503 (8th Cir.2000), citing *Nevland.*[2]

█ In the opinion of the Court, the ALJ required the Commissioner to carry her burden of coming forward with medical evidence of Plaintiff's residual functional capacity. Dr. Babcock provided medical evidence of Plaintiff's physical abilities. Although the doctor did not assign a specific lifting limitation, the doctor did not preclude all lifting, and said that Plaintiff is not precluded from handling objects. Likewise, while Dr. Babcock stated that prolonged standing is not possible because of the plantar warts, he said that a varied activity with some standing would certain-

**2.** The Court is aware that the Commissioner has published a proposed rule clarifying the burden of proof at steps 4 and 5 of the se-

quential evaluation. The proposed rule is published at 67 Fed.Reg. 39904 (June 11, 2002).

ly be possible. Dr. Babcock is the only doctor who examined Plaintiff who commented on her ability to work. At the time of the hearing, it had been a year since Plaintiff had sought treatment for her psoriasis or plantar warts. While the Court recognizes that Plaintiff has not been able to tolerate certain medications that have been prescribed, Dr. Babcock pointed out that there are other treatments available that Plaintiff has not attempted. It should also be pointed out that Plaintiff is not without means to pay for medical care—a Department of Vocational Rehabilitation note dated December 7, 1995, states: "She does have medical coverage through her husband's insurance ..." Tr. at 391. In *Moad v. Massanari,* 260 F.3d 887, 892 (8th Cir.2001), the Court held that failure to seek medical assistance for alleged physical impairments contradicts subjective complaints of a disabling condition and supports ALJ's decision to deny benefits. In *Young v. Apfel,* 221 F.3d 1065, 1069 (8th Cir.2000), the Court wrote that it was significant that no physician who examined claimant submitted a medical conclusion that the claimant was disabled and unable to perform any type of work. It is interesting to note that Dr. Babcock is a physician at the McFarland Clinic which is where Plaintiff sought medical care in the past.

■ In addition to medical evidence, the ALJ may consider other evidence in the record which supports Plaintiff's residual functional capacity to work. *See e.g. Dykes v. Apfel,* 223 F.3d 865, 866–67 (8th Cir.2000)(residual functional capacity finding must be supported by some medical evidence but is based on all the evidence in the record). The ALJ pointed to Plaintiff's ability to bowl as evidence which belies her claimed inability to function physically or mentally. The ALJ wrote:

> In addition, the claimant's testimony contained significant contradictions which reflected poorly upon her credibility. Specifically, although she testified to significant limitations in exertional activities, in the ability to grip objects and social interactions in the work place due to psoriatic lesions, reports contained in the record indicate the Claimant and her husband belonged to a bowling league and bowled for 2 hours at least once a week. Although she testified she discontinued bowling in 1997, reports dated as late as February 1998 indicate the Claimant's activities included bowling. (Exhibits 2E/1 (Tr. at 238); 3E/4 (Tr. at 244); 9E/2 (Tr. at 280);10E/2 (Tr. at 284)). Not only does this activity require movement of the body in areas affected by the Claimant's psoriasis and gripping a bowling ball with three digits of the hand, it also involves interaction with other individuals and keeping a scheduled commitment. It is further noted the Claimant's assertion that she must avoid water and chemicals is inconsistent with her reported recreational activity of swimming. (Exhibit 3E/4 (Tr. at 244)).

Tr. at 29.

From a mental standpoint, Dr. Chaplik opined that Plaintiff is able to understand, remember and carry out instructions and that Plaintiff can maintain attention, concentration and pace. Dr. Chaplik said that any difficulty Plaintiff has with interaction with co-workers, supervisors or the public was due to Plaintiff's appearance rather than to Plaintiff's emotional problems. Dr. Chaplik's opinion is not contradicted by any treating source including Dr. Parulekar, the psychiatrist who prescribed Plaintiff's medication at the Richmond Center.

■ The ALJ found that Plaintiff's severe mental impairment is bi-polar disorder. The Court can find no medical evidence to support that finding. Rather, the

medical evidence from both the Mental Health Institute and the Richmond Center as well as Dr. Chaplik, indicates that Plaintiff suffers from a dysthymic disorder. On remand, among other things, the ALJ should determine the correct diagnosis of the impairments used in the step 2 finding upon which the finding of residual functional capacity is ultimately based.

In addition to requiring the Commissioner to come forward with medical evidence of Plaintiff's residual functional capacity, the Commissioner must also prove that jobs exist that a person can perform in light of the age, education, past work experience and residual functional capacity of the claimant. *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir. 1983). The Commissioner may meet the second prong of her burden in one of two ways. Where the claimant suffers solely from one or more exertional impairments, the Commissioner may refer to the Medical Vocational Guidelines found at 20 C.F.R. Part 404, Subpart P, Appendix 2. Where, however, the claimant also suffers from a non-exertional impairment which causes the claimant's relevant characteristics to differ in any material respect from those characteristics contemplated by the Guidelines, the Guidelines may not be applied unless the Guidelines direct a finding of disabled. If the Guidelines are not applicable, the case law requirements pre-existing the guidelines including use of expert vocational testimony retain their full vigor. *Lewis v. Heckler*, 808 F.2d 1293, 1297–98 (8th Cir.1987); *McCoy v. Schweiker*, 683 F.2d. at 1146.

In this case, the ALJ called a vocational expert who responded to various hypothetical questions posed by the ALJ. Although the vocational expert agreed that Plaintiff is unable to do her past relevant work, he testified that there is unskilled sedentary work which can be done under the hypothetical upon which the ALJ relied as the basis of her residual functional capacity finding. However, as will be shown below, the vocational expert's testimony in this case falls short of providing the evidence necessary to meet the second prong of Commissioner's burden.

After the vocational expert testified that Plaintiff is not able to do her past relevant work, he cited categories of jobs which included laborers except construction and assembler jobs. Tr. at 128. He later said that this information came from a publication to which he referred as "Department of Labor statistics and their census code." He said: "It would take into account, *I assume*, jobs that are described in the *Dictionary of Occupational Titles* (DOT) but possibly others as well." (emphasis added) Tr. at 131.

In Social Security Ruling (SSR) 00–4P, 2000 WL 1898704 (S.S.A.), the Commissioner wrote: "In making disability determinations, we rely primarily on the DOT (including its companion publication the SCO (Selected Characteristics of Occupations)) for information about the requirements of work in the national economy. We use these publications at steps 4 and 5 of the sequential evaluation process...."

Because he did not refer to the DOT, the vocational expert did not identify specific jobs which could be performed given the residual functional capacity found by the ALJ at step 5 of the sequential evaluation. Nor, did he inform the ALJ of the numbers of the specific jobs in the regional and/or national economy. In *Ellison v. Sullivan*, 921 F.2d 816, 821 (8th Cir.1990), citing SSR 83–12, the Court held that among the issues the vocational expert is called on to address he or she must identify jobs which are within the residual functional capacity set out in the hypothetical and provide a statement of the incidence of such jobs in the region in which the claimant lives. In *Ellison*, the voca-

tional expert testified that there were other industrial truck driver jobs that did not involve lifting, but because he did not specify what those jobs were or how numerous they were, the Court held that it was error for the ALJ to have relied on that testimony to satisfy the Commissioner's burden. The Court wrote further, at 822: "Because there is no evidence of what jobs Ellison can perform given his restricted physical capacity, and because substantial evidence shows that Ellison's skills are nontransferable, the ALJ's determination that Ellison was not disabled is reversed."

Because the vocational expert did not identify specific jobs which can be done given the residual functional capacity found by the ALJ, the Commissioner's burden of proving that jobs exist that such a person can perform was not met. Failure to shift the burden of proof is reversible error. *Talbott v. Bowen*, 821 F.2d 511, 514 (8th Cir.1987) (Unless the case is one in which the outcome should be clear regardless of who bears the burden of proof, case will be remanded for further proceedings).

Here, as in the *Ellison* case, Plaintiff is unable to do her past relevant work and she has no transferable skills. Ellison, however, was 56 years old and had a fourth grade education. The medical vocational guidelines, therefore, directed a finding of disabled. *Ellison* at 817. In the case at bar, Plaintiff is a younger individual and the guidelines do not direct a finding of disabled. For that reason, it is necessary to remand the case in order to obtain vocational expert testimony which fulfills the Commissioner's obligation to determine whether unskilled sedentary jobs exist that Plaintiff is able to perform given her severely impaired physical and mental functional capacity.

## CONCLUSION AND DECISION

Having reviewed this record in detail, considering the evidence which supports the Commissioner's decision as well as the evidence which detracts therefrom, the Court cannot find that the decision to deny benefits is supported by substantial evidence on the record as a whole. The case, therefore is reversed and remanded to the Commissioner for a new decision consistent with this opinion.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406 B), and LR 54.2(b).

IT IS SO ORDERED.