United States Court of Appeals
For The Eighth Circuit

_____

No. 99-2364
_____

Jerold H. Nevland,                             *
                                               *
        Appellant,                             *
                                               *
        v.                                     *        Appeal from the United States
                                               *        District Court for the
Kenneth S. Apfel,                              *        District of North Dakota
Commissioner of Social Security,               *
                                               *
        Appellee.                              *

_____

Submitted:  February 14, 2000

Filed: March 2, 2000

_____

Before BEAM, J. GIBSON Circuit Judges, and PRATT[1], District Judge.

PRATT, District Judge

        Jerold H. Nevland appeals from the judgment of the United States District Court
for the District of North Dakota which upheld the final decision of the Commissioner
that he is not entitled to Social Security benefits based on disability.

_____

1. The Hon. Robert W. Pratt, United States District Judge for the Southern District
of Iowa, sitting by designation.

Nevland filed an application for disability benefits in May 1996. AR at 91-93. After a hearing, an Administrative Law Judge (ALJ) issued a Notice of Decision - Denial on June 25, 1997. The ALJ found that, although Nevland is unable to do his past relevant work, he has the residual functional capacity (RFC) for work except that he is unable to lift more than ten to fifteen pounds at a time, or to work without being able to alternate between sitting and standing and/or walking in order to endure an eight-hour workday. AR at 24. Based on the testimony of a vocational expert, the ALJ found that Nevland can work at jobs such as order taker, telephone sales, and information clerk. Therefore, the ALJ held that Nevland is not disabled nor entitled to the benefits for which he applied. AR at 25.

Nevland stated, on a Disability Report, that he twice injured his left knee and was twice required to have surgery. He stated that he was in constant pain which required the use of medication and a cane. AR at 98.

MEDICAL EVIDENCE

The medical records establish that Nevland was hospitalized from September 27 to October 4, 1994 with an upper gastrointestinal bleed. On September 28, "he underwent a gastroscopy with Clo test and bicap of a duodenal ulcer." The bleeding ceased thereafter. AR at 132.

Nevland was seen on July 8, 1994 by Audrey Kazmierczak, MA, of the Employee Assistance Program at St. Alexius Medical Center in Bismark, North Dakota, on referral from his supervisor at the Post Office because of over-utilization of sick leave. AR at 162-63. During the intake interview, Nevland reported that 2-3 years prior thereto he had been treated for depression with Prozac and therapy. AR at 163. The therapist wrote that Nevland identified symptomatology consistent with depression. It was noted that Nevland would see a Dr. Roxas on August 16 and would return to see the therapist on August 26, 1994. AR at 162.

Nevland saw Dr. Roxas on August 16, 1994. AR at 202-05. Nevland reported that he had suffered from depression all his life. He also reported that he has "what appear to be mild episodes of panic attacks." AR at 202. After his mental status examination, Dr. Roxas diagnosed: dysthymia; possible panic disorder without agoraphobia; possible generalized anxiety disorder; and, rule out obsessive compulsive disorder. Dr. Roxas prescribed Zoloft. AR at 205.

When Nevland saw Dr. Roxas on September 14, 1994, he reported that he had been taking his son's Ritalin which seemed to help his ability to concentrate. During the initial interview, Nevland described problems with memory and concentration (AR at 202), and on September 14, Dr. Roxas diagnosed possible attention deficit hyperactivity disorder, residual type. The doctor added Ritalin to the medication regimen. AR at 201.

When he was seen October 12, 1994, Nevland reported to Dr. Roxas that he was doing very well. Nevland stated that his concentration had improved and that he was able to read and was able to complete most things. The doctor's diagnosis was dysthymia and attention deficit hyperactivity disorder, residual type. AR at 199. Nevland reported doing well when seen December 13, 1994 (AR at 197), January 19, 1995 (AR at 196), and April 26, 1995 (AR at 195).

On May 1, 1995, after he had injured his back, Nevland told Dr. Roxas that he felt more depressed. On this occasion, the doctor added possible adjustment disorder with mixed emotional features to the diagnoses. AR at 193. On August 16, 1995, Nevland had returned to work and was feeling quite well. AR at 192.

After he hurt his knee, Nevland told Dr. Roxas on March 6, 1996 that he was not doing well. The doctor prescribed Ambien to help Nevland sleep. AR at 190. When seen on May 10, 1996, Nevland was working in a light duty capacity but he reported that his mood and motivation were both down and that he was sleeping poorly.

Nevland said that he felt stressed at work and was concerned that he might lose his job. Dr. Roxas added possible major depression, single episode, moderate, to the diagnoses. AR at 188.

When he was seen on July 15, 1996, Nevland was on permanent total disability and he reported that he was keeping busy, and looking forward to giving his time to various activities or organizations that need his help. The stress of working had disappeared and he did not have to worry about finances. Nevertheless, Nevland said that he felt tired and fatigued and that it was hard to motivate himself. He also said that his concentration was not good. AR at 186.

On August 14, 1996, Nevland told Dr. Roxas that his mood was up and down, unrelated to any kind of stress, and that he was having more down days than before. Dr. Roxas noted that Nevland was walking with a cane but that his gait was steady. The doctor commented that Nevland did not appear to be overtly depressed. AR at 184. On October 4, 1996, Dr. Roxas had tried switching Nevland from Zoloft to Effexor. After an initial bad experience, however, Nevland discontinued the Effexor. Dr. Roxas explained that the symptoms were probably caused from withdrawing from the Zoloft. He was encouraged to begin the Effexor again. AR at 246. On November 5, 1996, Nevland reported that he was somewhat better and that he was tolerating the Effexor but that he still needed the Ritalin. AR at 245.

On January 23, 1997, Nevland told Dr. Roxas that he was not doing very well since he had stopped taking Ritalin. He said that it was hard for him to concentrate, that he was shaky, did not have energy, that he liked to sleep all the time, and that he felt down. Nevland appeared depressed to the doctor. Dr. Roxas observed that although Nevland was walking without a cane[2], his gait was steady. AR at 243. On

2. When asked about this statement at the hearing, Nevland said that he did not understand why the doctor had written that because he always uses a cane when he

February 27, 1997, Nevland told Dr. Roxas that he was doing better, that the Ritalin was helpful, that he had more energy, and that his mood was good. Nevland was planning to start working as a volunteer documenting the old houses in his town. He was also doing some work with stained glass and doing some work in his home. Nevland did not appear to be depressed and appeared to be in a good mood. AR at 241.

Nevland underwent physical therapy on March 14, 1995 because of low back and left leg pain. Nevland complained of constant shooting pain and spasms down his leg to his toes as well as "charlie horses" in his calf. Nevland reported that he had injured his back on January 24, 1995 while lifting a box that weighed 104 pounds. AR at 147. The physical therapist opined that Nevland showed possible signs of a bulging disc. AR at 148. According to a treatment note from John Botsford, M.D., dated June 1, 1995, Nevland had returned to full duties and was experiencing no further symptoms. AR at 150.

Nevland injured his left knee again on January 26, 1996 while moving equipment at work . Nevland reported that he had arthroscopic surgery on both knees some years before. AR at 150. A note from St. Alexius Medical Center dated March 14, 1996, states that the prior procedure had been done on April 15, 1994. AR at 152. A video arthroscopy of the knee on March 14, 1996, showed a probable torn meniscus versus articular cartilage erosion becoming more severe. C.P. Dahl, M.D. wrote, at the conclusion of the study: "I think there is a possibility that he may not be able to continue to perform the type of work that he is presently doing and needs to drift into a more sedentary type of occupation in the future." AR at 153. On March 18, 1996, Nevland underwent video arthroscopy, synovial biopsy, chrondroplasty of the patella and medial femoral condyle of his left knee. AR at 154.

is walking. AR at 56.

Nevland was seen by Nowarat Songsiridej, M.D., on April 8, 1996, to rule out any rheumatic disease. AR at 167-69. Nevland told the doctor that he had no trouble with his joints with the exception of his left knee. AR at 167. Nevland reported that he was taking the medication Zoloft. AR at 168. Dr. Songsiridej opined that Nevland's problem was due more to mechanical injury than to residual from his history of rheumatic disease. AR at 169. An X-ray report of Nevland's left knee, dated July 18, 1996, showed "very minimal arthritic productive lipping medial aspect of the joint on the medial femoral condyle. The cartilage interval measures 4 MM which according to the AMA guidelines is within normal limits." AR at 176.

Nevland was seen by Paul E. Jondahl, M.D. July 24, 1996, complaining of fatigue, diarrhea, mild stomach aches and occasional blood in his stools. Nevland also reported "something protruding above his belly-button now along the line of his incision." The doctor ordered a flexible sigmoidoscopy and a barium enema. AR at 180. No abnormalities were noted from either procedure. AR at 177.

The only opinions expressed regarding Nevland's residual functional capacity are from doctors who completed forms for Disability Determination Services, but who had never examined him. These doctors opined that Nevland is capable of lifting 20 pounds occasionally, and 10 pounds frequently. In addition, they opined that he can stand and/or walk, as well as sit, for six hours per day. They also opined that Nevland can occasionally climb, balance, stoop, kneel, crouch, and crawl. AR at 208-09 and 216-17. Other doctors who had never examined or treated him, opined that Nevland does not have a severe mental impairment. AR at 223 and 232.

# ADMINISTRATIVE HEARING

Nevland appeared, with counsel, at a hearing on March 27, 1997. AR at 30-74. Nevland testified that the only work he had been doing was volunteer work taking pictures of old houses for the State Historical Society of North Dakota. AR at 38; *see also* AR at 131, which is a copy of a story which appeared in the *Bismarck Tribune*. Nevland said that he volunteers two days a week. AR at 39.

Nevland testified that he experiences pain on a daily basis. When asked to quantify his pain, he said that on a scale of 1 to 10, he would place the average level of pain at six or seven. AR at 44. When asked about his physical abilities, Nevland said that he has no problem sitting and that he had not been given any sitting restrictions. AR at 58-59. He said that he is able to stand, without his cane, for five minutes and with the cane for fifteen minutes. AR at 59. He estimated that he could walk two, possibly three, blocks. AR at 45. Nevland testified that although the doctor had put a three pound lifting limit on him, he could actually lift ten or fifteen pounds. AR at 61. Nevland said that depression was not the reason he quit working, but that the depression was getting worse since he stopped. AR at 57. In addition to depression, Nevland testified that he suffers from attention deficit disorder which makes it difficult for him to stay focused and to concentrate on projects. AR at 37. He said that his wife complains that he begins several projects, none of which are completed. AR at 48. Nevland said that, because of his memory problems, he must write notes to himself about anything he needs to do. AR. At 51.

After Nevland and his wife testified, the ALJ called Earl Huston to testify as a vocational expert. AR at 66. The ALJ asked if a hypothetical person would be able to work if everything testified to by Nevland and his wife were accepted as true. The vocational expert responded that the level of pain would prohibit competitive work of any kind. AR at 68-69. Thereafter the ALJ asked:

Okay. Well, hypothetically speaking, if a person can control their pain with the use of either medication or by self discipline so that they could persist in a normal work day, and also if their depression were under control with medication so that they could persist around a normal work day, and their lifting restrictions were in the 15 pounds and no particular problems sitting, grasping, handling, fingering, but there would be some limited standing, any postural relief for that, if I had someone with those limitations could that person do anything recognized as substantial gainful activity in the national economy?

AR at 69. The vocational expert responded that such a person could work at jobs such as order taker, telephone sales, and information clerk. The vocational expert said that they were unskilled sedentary jobs. AR at 70.

In his decision, the ALJ found that Nevland is unable to do any of his past relevant work, but that he has the residual functional capacity to do the jobs cited by the vocational expert at the hearing. AR at 24.

## DISCUSSION

"Our review is limited to whether the Commissioner's denial of benefits is supported by substantial evidence in the record as a whole." *Terrell v. Apfel*, 147 F.3d 659, 661 (8th Cir. 1998) (citations omitted). Substantial evidence exists if a reasonable mind would find such evidence adequate. *Id*. A reviewing court "may not reverse merely because substantial evidence would [also support] an opposite decision." *Id*. (internal quotations and citations omitted).

*Jackson v. Apfel,* 162 F.*3*d 533, 536-37 (8th Cir. 1998). In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Willcutts v. Apfel,*143 F.3d 1134, 1136 (8th Cir. 1998) quoting *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir. 1975).

In our circuit it is well settled law that once a claimant demonstrates that he or she is unable to do past relevant work, the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do. *McCoy v. Schweiker,* 683 F.2d 1138, 1146-47 (8th Cir. 1982)(en banc); *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir. 1983). It is also well settled law that it is the duty of the ALJ to fully and fairly develop the record, even when, as in this case, the claimant is represented by counsel. *Warner v. Heckler*, 772 F.2d 428, 431 (8th Cir. 1983).

In the case at bar, just as in *Warner*, the ALJ recognized that if Nevland's testimony was accepted as fact, no work would be possible and he would qualify for the benefits for which he had applied. Nevland came forward with medical evidence which establishes that he suffers from medically determinable physical and mental impairments which prevent him from performing his past relevant work. The ALJ found, at step two of the sequential evaluation, that the severe impairments are:

> [M]inimal arthritic lipping of the medial aspect of the left knee joint on the medial femoral condyle, a history of traumatic arthritis, left knee (status post arthroscopy with synovial biopsy (positive rheumatoid factor) and chondroplasty of the patella and medial femoral condyle) and a history of childhood rheumatic disease.

AR at 23. The record also establishes that Nevland suffers from dysthymia and attention deficit hyperactivity disorder. What is not clear is how these impairments, which prevent Nevland from doing his past work, affect his residual functional capacity to do other work. In spite of the numerous treatment notes discussed above, not one of Nevland's doctors was asked to comment on his ability to function in the workplace.

As Circuit Judge Richard S. Arnold said when he sat as a district court in *Ford v. Secretary of Health and Human Services*, 662 F.Supp. 954, 955 (W.D. Ark. 1987): "The key issue in this case is Ford's RFC. This is a medical question." "The issue, of

course, is not whether Ford has had heart attacks, documented or not, but how his heart attacks are now affecting his ability to function physically." *Id.* at 956.

In the case at bar, there is no *medical* evidence about how Nevland's impairments affect his ability to function now. The ALJ relied on the opinions of non-treating, non-examining physicians who reviewed the reports of the treating physicians to form an opinion of Nevland's RFC. In our opinion, this does not satisfy the ALJ's duty to fully and fairly develop the record. The opinions of doctors who have not examined the claimant ordinarily do not constitute substantial evidence on the record as a whole. *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999). Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits. *Id.* In our opinion, the ALJ should have sought such an opinion from Nevland's treating physicians or, in the alternative, ordered consultative examinations, including psychiatric and/or psychological evaluations to assess Nevland's mental and physical residual functional capacity. As this Court said in *Lund v. Weinberger*, 520 F.2d 782, 785 (8th Cir. 1975): "An administrative law judge  may not draw upon his own inferences from medical reports. *See Landess v. Weinberger,* 490 F.2d 1187, 1189 (8th Cir. 1974); *Willem v. Richardson,* 490 F.2d 1247, 1248-49 n. 3 (8th Cir. 1974)."

For all of the foregoing reasons, we reverse and remand the case to the district court with instructions to remand to the Commissioner for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT

-10-