# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 02-3502

———————

Marvin Baldwin, Sr.,         \*
       \*
       Appellant,        \*    Appeal from the United States
       \*    District Court for the
       v.        \*    Eastern District of Missouri.
       \*
Jo Anne B. Barnhart, Commissioner,    \*
Social Security Administration,        \*
       \*
       Appellee.        \*

———————

Submitted: June 13, 2003

Filed: November 13, 2003

———————

Before MELLOY, BEAM, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

Marvin Baldwin, Sr. appeals the district court's[1] judgment affirming the denial of his application for Social Security disability benefits. We affirm.

_____

[1] The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

## I. *Background*

Baldwin applied for disability benefits on July 12, 1996, claiming that he became unable to work on July 6, 1996.[2] He alleged disability due to ulcers, poor eyesight, problems with his left foot, back, and legs, and stress syndrome. Baldwin completed sixteen years of school and earned a GED, and his past work included trash collector, laborer, and heavy-equipment operator.

## A. *Medical History*

Baldwin's relevant medical history can be divided into two categories–records generated by Baldwin's independent visits to health-care providers and records generated at the request of the Social Security Administration ("Administration").[3]

---

[2] Baldwin filed prior applications for disability insurance benefits and supplemental security income ("SSI") benefits on January 12, 1994, alleging an original onset date of July 15, 1991. The Social Security Administration denied these applications initially and on reconsideration, and Baldwin requested a hearing. However, Baldwin's current administrative record does not include records evidencing a denial of those applications.

[3] Some records created prior to Baldwin's alleged onset date of July 6, 1996, are included in the administrative record in this case, including records from Sarwath Bhattacharya, M.D., who examined Baldwin in January 1994 at the request of the Administration pursuant to Baldwin's previous applications. Dr. Bhattacharya reported that Baldwin suffered from dizziness and ringing in the ears due to high blood pressure, occasional rectal bleeding due to lack of fiber in his diet, chest pain from shrapnel injuries, and hand problems due to carpal tunnel syndrome that resolved after surgery. Dr. Bhattacharya noted that Baldwin's high blood pressure was treatable, but that Baldwin was noncompliant with his medication. Baldwin took no other medications at that time. Dr. Bhattacharya also noted that Baldwin had not suffered sensory loss or grip strength loss due to the carpal-tunnel release. Mental health progress notes created by Grace Hill Neighborhood Health Center in February and March 1996 indicate that Baldwin felt depressed and angry, but that he did not want to take medication for his symptoms and did not plan to stop drinking alcohol. He indicated that he performed casual labor two to three times a week to earn money to buy drugs.

## i. Independent Visits

Baldwin's independent visits produced reports detailing his various complaints. On November 15, 1996, an upper gastrointestinal series test showed a moderate deformity and ulceration of the duodenal bulb. An x-ray of Baldwin's right shoulder dated December 30, 1996, was normal, and a chest x-ray revealed no acute disease.

On January 1, 1997, Baldwin went to the emergency room with complaints of right arm and chest pain. X-rays of the chest and shoulder showed no active cardiopulmonary disease and a normal right shoulder. Baldwin was diagnosed with right shoulder bursitis and was prescribed Ibuprofen. Baldwin returned to the emergency room on January 19, 1997, with complaints of right shoulder pain and hand numbness. Baldwin was diagnosed with cervical radiculopathy. He was prescribed Ibuprofen, advised to stop taking Naprosyn, and instructed to wear a cervical collar for comfort.

Baldwin presented to People's Health Center on January 24, 1997, with complaints of a month-long history of right shoulder and neck pain. He also reported numbness in three fingers of his right hand. Baldwin indicated that Ultram and anti-radiculopathy medicines provided him no relief; therefore, the treating physician prescribed Darvocet and referred Baldwin to an orthopedist. The administrative record contains no record showing that Baldwin saw an orthopedist pursuant to that referral.

On February 11, 1997, Baldwin went to St. Louis Regional Medical Center complaining of neck pain beginning in the 1960s and bilateral arm numbness beginning in 1984. Examination revealed neck pain with side bending. The examining physician noted that Baldwin was uncooperative. The examining physician's evaluation suggested C5-C6 radiculopathy.

Baldwin returned to People's Health Center on February 26, 1997, for a follow-up of right shoulder pain and right hand numbness. He claimed that his medications were not helping. Baldwin reported that he had seen a psychiatrist the previous week and had been placed on Prozac and other medication to help him sleep. He was advised to continue taking Ultram for pain control and to remain on Tagamet for peptic ulcer disease. In addition, Baldwin was encouraged to follow up with a psychiatrist and continue taking his medications. The administrative record does not reflect that Baldwin returned to the psychiatrist.

*ii. Administration Referrals*

The Administration sent Baldwin to four consultative examinations. On September 3, 1996, he saw Llewellyn Sale Jr., M.D. Baldwin reported impairments in his back, side, arms, legs, and left foot due to shrapnel remnants from his service in Vietnam.[4] He wore a support in his left shoe, and he noted a "peculiar" feeling in his stomach and a twenty-pound weight loss in the three months prior to the appointment. He smoked forty cigarettes a day when he could get them. Baldwin reported a past history of alcohol and drug abuse.

Dr. Sale reported a decreased range of motion of the back as well as slight tenderness over the sacroiliac joints in the lumbar spine and very slight paravertebral lumbar muscle spasm. Straight leg raising caused slight discomfort in the thigh. Baldwin experienced tenderness to pressure on the plantar surface of the left foot in the metatarsal area. Dr. Sale noted no specific joint abnormalities and only a slight decrease in muscle strength, without motor or sensory deficits. Dr. Sale indicated that Baldwin was somewhat belligerent during the examination. He documented multiple aches and pains in the back, side, arms, legs, and foot, some of which were due to shrapnel wounds. Dr. Sale noted that Baldwin experienced discomfort in the lower

---

[4] Baldwin had previously indicated, prior to his alleged onset date, that he did not want the shrapnel surgically removed.

back when bending. Baldwin was unable to squat, had a poor ability to heel walk, and did not toe walk due to pain. Baldwin's gait was only slightly impaired with a slight limp on the left without the use of an assistive device. Dr. Sale also noted that Baldwin had a "stress reaction" that may have influenced him to some degree.

On September 23, 1996, Baldwin saw Paul W. Rexroat, Ph.D., for a second consultative examination. Baldwin indicated that he served in Vietnam from 1965 to 1967, but was discharged for "bad behavior." He noted that he changed jobs frequently due to difficulty working with others. Baldwin denied receiving any psychiatric treatment or counseling with the exception of one visit for psychotherapy. Upon examination, Dr. Rexroat noted that Baldwin was mildly suspicious, but was not anxious, tense, or weepy. Dr. Rexroat gave him a Global Assessment of Functioning (GAF) score of 68 out of 100. Dr. Rexroat noted that Baldwin initially exhibited a restricted emotional response, but that he began responding normally over the course of the examination. Although Baldwin stated that he was depressed, Dr. Rexroat noted that Baldwin's affect and energy level were normal, and he did not appear to be depressed. His activities were not diminished, and his sleep and appetite were normal. When Baldwin was asked to describe his "flashbacks," he described "intense thoughts or brooding about things that angered him." Dr. Rexroat believed that Baldwin's suspicions of people attacking him were not unusual due to his homelessness. Dr. Rexroat suspected that Baldwin abused alcohol and drugs. He opined that Baldwin had mild limitations in activities of daily living, moderate limitations in social functioning, and mild limitations in deficiencies in concentration, persistence, pace, and memory. Dr. Rexroat diagnosed antisocial personality disorder.

On January 8, 1997, Ibe Onuka Ibe, M.D., performed a third consultative examination. Baldwin stated that he received a "bad-behavior" discharge from the service because he "blew up 15 people and killed one of them." He had been fired from almost all of his jobs because he could not get along with other people. Baldwin indicated that he began drinking at the age of five and still drank heavily; however,

he believed drinking had never been a problem for him. Dr. Ibe noted that Baldwin claimed he had never received any psychiatric treatment. During the examination, Baldwin left when Dr. Ibe suggested that he possibly had an attitude problem. Dr. Ibe's diagnoses were alcohol dependence, impulse-control disorder, possible dysthymic disorder, and antisocial personality disorder. He assigned Baldwin a GAF score of 35.

On January 14, 1997, Warren M. Lonergan, M.D., performed a fourth consultative examination. Baldwin reported that he smoked approximately four cigarettes per day and did not drink alcohol. Examination revealed full range of motion of the back without any tenderness or paravertebral muscle spasm. Straight leg raising was negative. With regard to the musculoskeletal examination, Dr. Lonergan stated, "In looking over all the areas of the body in which he complains I could find nothing with which to believe that he has any significant pain of the area." He concluded that Baldwin was capable of sitting, standing, walking, lifting, carrying, handling, hearing, speaking, and traveling. He attached no limitations to these activities.

## B. *Administrative Hearing and Appeals*

At the hearing on May 27, 1997, Baldwin testified that he was disabled due to numbness and other problems with his back, knees, left foot, and neck, and he claimed he suffered from depression. He claimed he had not abused alcohol and cocaine since 1990. Baldwin indicated that he currently drank non-alcoholic beer, and that he had not had alcohol for three or four months. Baldwin testified that when he drank alcohol, his Prozac and pain pills were ineffective. Baldwin testified that he smoked a package of cigarettes every two to three days. Baldwin testified that he lived in a shelter on and off for two years, but he had lived in an apartment during the nine months prior to the hearing. Baldwin was able to cook, clean, mop, wash dishes, shop for groceries once a month, do laundry, occasionally help the church pick up trash off the lawn, listen to the radio, and visit with friends and relatives "just about

every day." In addition, he testified that he attended four years of trade school operating heavy equipment. He used his training to operate backhoes, graders, trenchers, cherry pickers, dozers, compactors, air compressors, concrete rakers, and cranes. Baldwin testified that he could lift or carry twenty to twenty-five pounds, but that the farthest he could walk was two or three blocks due to problems with his left foot. Baldwin testified that he could stand for twenty to twenty-five minutes, and that if he altered his position, he could sit in a chair about an hour before having to get up. Baldwin testified that he could drive for a couple of hours.

After Baldwin testified, the Administrative Law Judge (ALJ) asked Arthur E. Smith, Ph.D., a vocational expert (VE), hypothetical questions concerning an individual of Baldwin's age, education, and past relevant work experience. The first hypothetical included facts regarding a person who retained the residual functional capacity (RFC) to lift and/or carry up to twenty pounds, but could walk no more than two or three blocks at one time and would need a sit/stand option. Dr. Smith testified that such an individual could perform other work in the national economy. Dr. Smith testified that Baldwin had acquired transferable skills from his work as a meter repairman, including the use of different types of tools and equipment as well as observing differences and inspecting procedures. Dr. Smith testified that Baldwin could perform the jobs of lock assembler, jewelry assembler, semi-conductor assembler, multi-focal lens assembler, frames inspector, coil inspector, type inspector, ampule examiner, polisher, driller, and grinder. Dr. Smith further testified that approximately 2,000 of these jobs exist in the St. Louis area, and that these jobs exist in significant numbers in the national economy.

The ALJ's second hypothetical presumed that Baldwin's testimony was fully credible. Based on that assumption, the vocational expert (VE) suggested that if Baldwin's alleged pain level was severe enough to be at "a level of distractibility that would not allow him to be productive for a full eight hour day," no jobs would be available. The third hypothetical presumed the elements in the first hypothetical,

including the added limitations of a "post carpal tunnel situation, to no frequent, continuous hand and arm activities." The VE responded that the jobs he named in the first hypothetical involved "frequent usage but not continuous usage," and that he was uncertain about how to answer the question.

On October 31, 1997, the ALJ issued a decision denying Baldwin's claim. The ALJ found that Baldwin's "complaints of disabling symptoms are not supported by the evidence and are not credible." The ALJ determined that Baldwin had degenerative disc disease with cervical radiculopathy, alcohol dependence, major affective disorder, depression, personality disorder, and impaired vision. The ALJ did not identify which impairments were severe. The ALJ determined that Baldwin did not meet or equal a listed impairment and that Baldwin had an RFC for light work, limited to lifting or carrying twenty pounds, walking two to three blocks, and with the need for a sit/stand option. The ALJ found that Baldwin's RFC precluded performance of his past relevant work as a utility worker, stocker, and laborer. However, at step five of the sequential evaluation, the ALJ determined that Baldwin was not disabled based on the medical reports, Baldwin's testimony, and the VE's response to the first hypothetical that there were a significant number of jobs available to Baldwin in the national economy. Upon review, the district court–upon recommendation of a magistrate judge–affirmed the ALJ's determinations. Baldwin appealed.

## II. *Standard of Review*

We review de novo the district court's decision upholding the denial of Social Security benefits. *Lowe v. Apfel*, 226 F.3d 969, 971 (8th Cir. 2000); *Pettit v. Apfel*, 218 F.3d 901, 902 (8th Cir. 2000). When considering whether the ALJ properly denied Social Security benefits, we determine whether the decision is based on legal error, and whether the findings of fact are supported by substantial evidence in the record as a whole. *Clark v. Chater*, 75 F.3d 414, 416 (8th Cir. 1996); *Baker v. Secretary of Health and Human Services*, 955 F.2d 552, 554 (8th Cir. 1992).

Substantial evidence is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions does not prevent an administrative agency's findings from being supported by substantial evidence." *Cruse v. Bowen*, 867 F.2d 1183, 1184 (8th Cir. 1989) (quoting *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620 (1966)). We must search the record for evidence contradicting the Secretary's decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial. *Cline v. Sullivan,* 939 F.2d 560, 564 (8th Cir. 1991). We may not reverse merely because substantial evidence would have supported an opposite decision. *Grebenick v. Chater*, 121 F.3d 1193, 1198 (8th Cir. 1997). Evidence that detracts from the Secretary's decision is considered, but even if inconsistent conclusions may be drawn from the evidence, the decision will be affirmed where the evidence as a whole supports either outcome. *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995); *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995). We do not reweigh the evidence presented to the ALJ, and it is "the statutory duty of the ALJ, in the first instance, to assess the credibility of the claimant and other witnesses." *Bates*, 54 F.3d at 532 (citations omitted).

## III. *Analysis*

Baldwin raises two main arguments on appeal. Baldwin first argues that the ALJ improperly assessed his RFC because the ALJ did not cite medical evidence to support the RFC assessment and failed to properly develop the record with reports from additional consultative medical exams. Second, Baldwin argues that the decision is not supported by substantial evidence because the ALJ relied on the erroneously-determined RFC assessment to deny benefits at step five of the sequential evaluation.

### A. *Development and Determination of RFC*

Baldwin claims that the ALJ did not sufficiently develop the record with medical evidence in the form of additional consultative examinations. As such, Baldwin argues, the ALJ's RFC determination was not based upon proper medical

evidence. Specifically, Baldwin asserts that the existing medical evidence that the ALJ used to assess his RFC did not provide necessary functional conclusions about his RFC. We disagree.

When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments and determine the claimant's RFC. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *Cunningham v. Apfel*, 222 F.3d 496, 501 (8th Cir. 2000). A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 404.1545. It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC. *Pearsall*, 274 F.3d at 1218. The ALJ must determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. *Id.*; *Anderson v. Shalala*, 51 F.3d 777, 779 (8th Cir. 1995).

Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir. 2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001). "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional. *See* 20 C.F.R. § 404.1545(c); *cf. Ford v. Secretary of Health and Human Services*, 662 F. Supp. 954, 955–956 (W.D. Ark. 1987) (RFC was "medical question," *id.* at 955, and medical evidence was required to establish how claimant's heart attacks affected his RFC, *id.* at 956) (cited with approval in *Nevland*, 204 F.3d at 858).

The ALJ determined two important aspects of Baldwin's RFC: (1) that Baldwin's mental limitations, once separated from his drug and alcohol abuse, did not significantly limit Baldwin's ability to function in the workplace; (2) that Baldwin's physical limitations restricted him to lifting or carrying no more than twenty pounds, to walking no more than two or three blocks at a time, and to needing a sit/stand option. The ALJ based these determinations not only on medical records but also on Baldwin's testimony.

Regarding Baldwin's mental limitations, he had only once independently gone for psychiatric or psychological treatment. Of the four consultative examinations ordered by the Administration, two involved psychological evaluations by Drs. Rexroat and Ibe. Dr. Rexroat opined that Baldwin had mild limitations in activities of daily living, moderate limitations in social functioning, and mild limitations in deficiencies in concentration, persistence, pace, and memory. Although Baldwin denied current alcohol use, Dr. Rexroat suspected that Baldwin continued to use alcohol or drugs. Dr. Rexroat's diagnosis was antisocial personality disorder. Approximately three months later, Dr. Ibe examined Baldwin, who told Dr. Ibe, in part, that he still drank heavily, but that he believed drinking had never been a problem for him, and that he had never received any psychiatric treatment. Dr. Ibe, however, could not finish the examination because Baldwin left when Dr. Ibe suggested that he possibly had an attitude problem. Dr. Ibe's diagnoses were alcohol dependence, impulse control disorder, possible dysthymic disorder, and antisocial personality disorder. Neither doctor indicated that Baldwin's psychological conditions prevented him from maintaining a job or functioning in the workplace.

With regard to the physical determinations made by the ALJ in his RFC analysis, we first note that the ALJ's listed limitations are based in major part on Baldwin's testimony. Baldwin's testimony regarding his daily activities and limitations provided the framework for the ALJ's lifting, walking, standing, and sitting restrictions. In addition, the medical evidence supports this assessment.

-11-

The Administration investigated Baldwin's physical condition through two consultative examinations with Dr. Sale and Dr. Lonergan. Baldwin first saw Dr. Sale, who reported that Baldwin experienced multiple aches and pains throughout his body due, in part, to shrapnel wounds. Dr. Sale noted Baldwin's limitations in bending, squatting, and heel and toe walking. Dr. Sale indicated that Baldwin's gait was only slightly impaired. Dr. Sale also noted that Baldwin had a "stress reaction," which possibly influenced him to some degree.

Dr. Lonergan reported that Baldwin had full range of motion in his back and straight leg raising was negative. With regard to the musculoskeletal examination, Dr. Lonergan stated, "In looking over all the areas of the body in which he complains I could find nothing with which to believe that he has any significant pain of the area." Dr. Lonergan concluded that Baldwin was capable of sitting, standing, walking, lifting, carrying, handling, hearing, speaking, and traveling, and he assessed no restrictions on these activities.

Other physicians noted few abnormalities, and none of Baldwin's independent physicians restricted or limited Baldwin's activities due to these findings. For example, an x-ray of Baldwin's right shoulder dated December 30, 1996, was normal, and a chest x-ray revealed no acute disease. On January 1, 1997, x-rays of Baldwin's chest and shoulder showed no active cardiopulmonary disease and a normal right shoulder. Baldwin was diagnosed with right shoulder bursitis and was prescribed Ibuprofen.

On January 19, 1997, an x-ray of Baldwin's cervical spine indicated no fractures or alignment abnormalities, but did reveal moderate to severe narrowing of the intervertebral disc space at C5-C6, more pronounced on the right. On February 11, 1997, examination of Baldwin's neck revealed neck pain with side bending. The examining physician's impression was C5-C6 radiculopathy. The medical reports–some produced in consultative exams and some from claimant-initiated

exams–reveal few objective findings to support Baldwin's pain and limitation complaints.

In addition, the ALJ determined that many of Baldwin's allegations–particularly his pain allegations–should be discounted because of the inconsistencies in his testimony. In evaluating subjective complaints, the ALJ must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole. *Id.* The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts. *Benskin v. Bowen*, 830 F.2d 878, 882 (8th Cir. 1987). Here, the ALJ assessed Baldwin's testimony regarding these factors and determined that his testimony discounted his subjective complaints of pain, particularly in light of the lack of objective findings despite repeated consultative and claimant-initiated medical examinations. In addition, the record indicates that Baldwin would, at times, maintain that he drank on a regular basis, and then other times indicate that he had not used alcohol or drugs in a considerable amount of time. These inconsistencies support the ALJ's decision to discount Baldwin's credibility and subjective complaints of pain.

Overall, while it is the ALJ's duty to develop the record, *Nevland*, 204 F.3d at 858, the ALJ is under no duty to provide continuing medical treatment for the claimant. Here, the ALJ properly developed the record by collecting Baldwin's records and by providing four consultative medical examinations (one of which Baldwin left early) to attempt to develop Baldwin's claim for disability benefits. However, the medical reports revealed no condition that would limit Baldwin's ability to function in the workplace to a degree that rendered him disabled.

B. *Substantial Evidence*

Baldwin next argues that substantial evidence does not support the decision because the ALJ relied on an erroneous RFC. An erroneously-determined RFC cannot provide substantial evidence to support a denial of benefits. *See Holmstrom v. Massanari*, 270 F.3d 715, 722 (8th Cir. 2000). However, in this case, the ALJ properly established Baldwin's RFC based on the medical and testimonial evidence in this record. Consequently, we hold the ALJ validly determined and applied Baldwin's RFC as part of the substantial-evidence equation to deny benefits. There is no error, and we affirm.

_____