Lawrence G. DENHOFF, Plaintiff,

v.

Michael J. ASTRUE, Commissioner of Social Security, Defendant.

No. 3:11–cv–134 RP–CFB.

United States District Court, S.D. Iowa, Davenport Division.

Nov. 27, 2012.

Michael DePree, Bowman & DePree LLC, Davenport, IA, for Plaintiff.

Gary L. Hayward, United States Attorney, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PRATT, District Judge.

Plaintiff, Lawrence G. Denhoff, filed a Complaint in this Court on October 28, 2011, seeking review of the Commissioner's decision to deny his claim for disability benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g).

Plaintiff filed his application for benefits on April 27, 2010. Tr. at 154–57. Plaintiff, whose date of birth is February 26, 1966 (Tr. at 154), was 44 years old at the time of the hearing. After the application was denied initially and on reconsideration, Plaintiff appeared at a hearing on August 4, 2011 before Administrative Law Judge Diane R. Flebbe (ALJ). Tr. at 30–68. The ALJ issued a Notice Of Decision—Unfavorable on August 15, 2011. Tr. at 6–25. The Appeals Council declined to review the ALJ's decision on October 7, 2011. Tr. at 1–3. Thereafter, Plaintiff commenced this action.

Following the sequential evaluation, the ALJ found, at the first step, that Plaintiff has not engaged in substantial gainful activity since his application for Title XVI benefits. At the second step, severe impairments were found to be cervical spine injury with surgery and residuals and degenerative joint disease of the knees. Tr. at 11. The ALJ found that none of these impairments were severe enough to qualify for benefits at the third step of the sequential evaluation. Tr. at 13 At the fourth step, the ALJ found:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional ca-

pacity to perform light work as defined in 20 CFR § 416.967(b) except no more than occasional climbing of ramps and stairs, balancing, stooping, kneeling, couching, and crawling; no climbing of ladders, ropes or scaffolds or work at unprotected heights or around unprotected hazardous machinery; no concentrated exposure to temperature extremes or respiratory irritants; and, no more than frequent handling and fingering bilaterally.

Tr. at 14. The ALJ found that Plaintiff has no past relevant work. Tr. at 23. The ALJ found that work exists in significant numbers in the national economy which Plaintiff can perform. Examples of such work were listed as assembler, plumbing hardware assembler, library page, clothes folder, lampshade assembler, surveillance system monitor, arcade attendant, and school bus monitor. Tr. at 24. The ALJ found that Plaintiff was not disabled nor entitled to the benefits for which he applied. Tr. at 25.

## MEDICAL EVIDENCE

A hospital noted dated May 10, 2009, signed by Srikanth Nallacheru, M.D., states that Plaintiff sought treatment for alcoholic intoxication and had been admitted. Before he could be seen by a doctor, however, Plaintiff ran away from the hospital. Following hospital protocol, and out of fear that Plaintiff would drive while intoxicated, the police were notified. Tr. at 370. While he was at the hospital, his blood alcohol was 324 mg per dL. A CT scan of Plaintiff's head was negative. Tr. at 372.

X-rays of Plaintiff's left foot on September 29, 2009, showed a fracture of the great toe. Tr. at 438.

On November 23, 2009, Plaintiff was seen at an emergency room for symptoms attributable to hypertension. Tr. at 439–43.

On December 4, 2009, Plaintiff was seen by Syed Haque [1], M.D. for a refill of medication for pain in his left knee caused by degenerative joint disease. Tr. at 428.

On December 13, 2009, Plaintiff called the police and asked them to take him to the hospital where he was seen in the emergency room suffering from alcohol intoxication. Tr. at 299.

On January 2, 2010, Plaintiff was treated at the Genesis Medical Center Emergency Room for alcohol intoxication with alcohol withdrawal. Tr. at 255–56 & 444–59. It was noted that Plaintiff blacked out, hit his head on the floor after which an ambulance was called. Plaintiff complained of pain in the neck and of pins and needles sensation in his fingers and toes. Tr. at 255. A CT scan of Plaintiff's head, made on January 2, 2010, did not show any evidence of hemorrhage, edema, or mass. Tr. at 287. A CT scan of the cervical spine showed degenerative changes at C5–6 and C6–7. Tr. at 288. On January 4, 2010, Plaintiff underwent a cervical MR scan because of severe neck, arm and hand pain. Tr. at 264. The scan showed injury with a large-based C5–C6 protrusion and mild generalized broad-based disk bulging at C4–C5. Tr. at 265. On January 4, 2010, Plaintiff returned to the hospital complaining of episodes of syncope. Tr. at 268–72.

On January 5, 2010, Plaintiff was seen by Chiedozie I Udeh, M.D. at the University of Iowa Hospitals and Clinics where Plaintiff had been transferred. Plaintiff told the doctor that the previous Saturday, he had been moving furniture when he fell and hit his head against a radiator, followed by a brief period of unconsciousness. Tr. at 387. After a physical examination

1. Medical records which appear below, indicate that Dr. Haque and Dr. Satti are physicians at Community Health Care, Inc in Davenport, Iowa.

(Tr. at 388), the assessment was that Plaintiff was critically ill with C5/C6 herniation and signs of central cord syndrome. Tr. at 389. Plaintiff underwent C4–5 and C5–6 anterior cervical discectomies and fusion on January 5,2010. Tr. at 415.

On February 3, 2010, Plaintiff saw Dr. Haque for post operative pain management. Plaintiff reported his pain to be 6 to 8 out of 10. The doctor advised Plaintiff to use Darvocet every 6–8 hours, in addition to Ultram which he had previously been prescribed by another doctor. Because Dr. Hague had only a limited supply of medication to give as samples, Plaintiff was advised to see a Doctor Satti. Tr. at 427.

Cervical x-rays taken on February 15, 2010, showed gross anatomic alignment and no hardware complication. Tr. at 436.

On February 19, Plaintiff saw Vinay Satti, M.D. Plaintiff had fallen the previous Saturday and broken his neck brace. Plaintiff also complained of increasing neck pain which was going into his arms and hands. Plaintiff saw Dr. Satti on February 22, 2010. Dr. Satti advised Plaintiff to go the emergency room as soon as possible for an MRI to check for new complications arising from the fall. Tr. at 426.

On March 9, 2010, Gregory Albert, M.D., a physician at the University of Iowa Hospitals and Clinics, wrote that since Plaintiff's surgery he continued to have problems, mainly with neuropathic pain from the spinal cord injury. Plaintiff's main complaint was "burning dysesthesias in his hands and forearms. He also has some burning and some dysesthetic sciatic pain in his bilateral thighs." Plaintiff also complained of pain between the toes of his feet. Tr. at 502.

Plaintiff was seen at the University on April 19, 2010, by Richard W. Rosenquist, M.D. Plaintiff reported pain from the shoulders to fingers and from the top of his legs to his toes. The pain was constant with numbness and tingling. Although Plaintiff had significant upper and lower extremity weakness, his strength had been slowly returning. It was noted that Plaintiff had quit drinking at the time of the injury in January. Tr. at 420. After a physical examination, Dr. Rosenquist opined that Plaintiff was suffering from a central pain syndrome following traumatic spine cord injury. The doctor increased the dosage of Plaintiff's medication—Lyrica, and began a prescription of amitriptyline for pain as well as for depressed mood and insomnia. Tr. 423.

Carole Kazmierski, Ph.D., a psychologist at Disability Determination Services, filled out a Psychiatric Review Technique for on May 25, 2010. Tr. at 460–73. Dr. Kazmierski opined that Plaintiff met the requirements of the listings of impairment, specifically listing 12.09 Substance Addiction Disorders. Tr. at 460. In the Consultant's Notes, Dr. Kazmierski pointed out that Plaintiff had not alleged any mental impairment, but that the medical records document numerous ER visits for alcohol intoxication with blood alcohol levels as high as 373. "Records note continuous alcohol abuse and a history of cocaine abuse, with cocaine-induced chest pain." The psychologist also wrote:

> The only mental impairments identified in this case are alcohol abuse and a history of cocaine abuse. Relevant listing is 12.09. Despite repeated hospital visits, claimant has been unwilling to pursue alcohol treatment. Due to his ongoing alcohol use, claimant is markedly impaired in his ability to sustain concentration and pace. He would be an unreliable employee, as drinking would interfere with his ability to maintain regular attendance and complete assigned tasks in an acceptable manner. There is no evidence to suggest that claimant would have any significant

mental impairment if he were to abstain from alcohol and drugs. Tr. at 472.

On August 16, 2010, Plaintiff was seen at the University of Iowa Hospitals and Clinics by Patrick W. Hitchon, M.D. Despite a good recovery, Plaintiff still had residual pain in both upper extremities, his torso and lower extremities. The pain in the upper extremities was a burning pain which was tolerable unless the skin was touched. There was an "itching pain" in the lower extremities. Overall, the pain had been getting worse, and the medication was helping only a little. Tr. at 507. Cervical spine x-rays showed that the hardware was intact. The doctor opined that the pain Plaintiff was having was from the spinal cord injury rather than a radicular pain. Plaintiff was advised to follow up with the pain clinic. Tr. at 508.

On October 12, 2010, Plaintiff saw Dr. Rosenquist and Eliel Ntakirutimana, M.D., at the University. Plaintiff told the doctors that he still could not feel his feet. He complained of weakness in his arms and legs. He said the pain was increased with activity and lifting anything greater than a pound. The pain was increased by neck rotation, flexion and extension of the neck. Plaintiff had a limited range of motion. Plaintiff reported decreased pain with medication, especially Lyrica which relieved the pins and needles sensation in his hands. Plaintiff was also on tramadol, amitriptyline and baclofen. Plaintiff had not gone to physical therapy, claiming he had not been instructed to do so. Tr. at 511. On physical examination, there was weakness in both upper and lower extremities to 4/5. Plaintiff denied anxiety, mood change or depression. The doctors observed that Plaintiff "walks gingerly. Sometimes he loses balance." Plaintiff's

sensory exam was intact bilaterally in the lower and upper extremities. Tr. at 513. An MRI indicated spinal cord edema[2] at C5–C6. The MRI also showed "prominent posterior disc osteophyte at C5–C6 causing moderate canal stenosis. Moderate neuroforaminal stenosis was also seen. The doctors' assessment and diagnoses were:

ASSESSMENT: This is a 44–year–old male status post spinal cord injury who sustained a spinal cord contusion. The patient was operated on and had a good outcome, but has had problems coping with life after the spinal cord injury. The patient still has weakness in both lower and upper extremities; however, he has no urinary incontinence or bowel movement habit changes. He is ambulating with no help. He is currently on tramadol 50 mg ... Lyrica 150 mg ... amitriptyline 25 mg ... and baclofen 10 mg BID.

DIAGNOSIS: Status post spinal cord injury at C5, C6 with contusion of the spinal cord resulting in anterior cord syndrome with persistent neuropathic pain.

The doctors increased the dosage of Lyrica, and continued the other medications. The doctors recommended physical therapy to strengthen his upper and lower extremity muscles. They also recommended a occupational therapy consultation. Tr. at 514.

On November 8, 2010, Plaintiff saw Dr. Satti, for a disability physical. The Doctor briefly reviewed the history of Plaintiff's spinal cord injury and surgery. The Doctor then wrote:

The patient continues to have tingling and numbness in both hands and feet. Also, unable to feel his feet yet. He is occasionally having problems with trip-

---

2. An accumulation of an excessive amount of watery fluid in cells or intercellular tissues.

Stedman's Medical Dictionary, 27th Edition.

ping. The patient unable to do productive work in view of his pain and other associated symptoms. He is currently put on Lyrica for his symptoms which makes him dizzy and makes him sleepy. Dr. Satti filled out a residual functional capacity form. Tr. at 515–19. The listed diagnoses were: Cervical radiculopathy and central cord syndrome. The prognosis was noted to be guarded. Symptoms were listed as pain in both arms and hands, numbness in both legs, and dizziness. Tr. at 515. The doctor opined that depression contributes to the severity of Plaintiff's symptoms. The doctor said Plaintiff's symptoms would frequently interfere with his ability to keep attention and concentration and that Plaintiff would be unable to do even low stress jobs. The doctor said Plaintiff could walk 5 blocks without carrying any weight; sit for an hour, and stand 30 minutes before needing to sit down. Tr. at 516. The doctor opined that in a work day, Plaintiff can sit about 2 hours and can stand/walk less than two hours. The doctor wrote that if working, Plaintiff would need to take unscheduled breaks every 1–2 hours for about 30 minutes. The doctor said Plaintiff needs to use a cane when walking. Plaintiff would be able to occasionally lift 10 pounds, rarely lift 20 pounds, and never lift 50 pounds. Tr. at 517. The doctor opined that Plaintiff could rarely look down or up—sustained flexion of the neck; occasionally turn his head to the right or left. The doctor said Plaintiff could occasionally twist; rarely bend, crouch/squat, and climb stairs; never climb ladders. The doctor said Plaintiff would have significant difficulty using his hands and arms. The doctor said Plaintiff could use his hands for grasping, turning, and twisting objects 10 percent of the time; use his fingers for fine manipulations 10 percent of the time; use his arms for reaching 20 percent of the time. The doctor wrote that Plaintiff would likely have good and

bad days and that if he had a job, he'd likely be absent from work more than four days per month. Tr. at 518.

On December 8, 2010, Plaintiff saw a physician at Community Health Care complaining of pain in his right knee. Plaintiff had been ·cleaning the kitchen floor. When he stood up, the knee gave way and he felt pain. The doctor opined that the pain was the result of a strain. Tr. at 525.

On March 8, 2011, Plaintiff complained to Dr. Satti of pain in both legs. Plaintiff said he was having tingling, numbness, and pain that stayed within the thighs and legs. He also reported weakness. Tr. at 524. Plaintiff was seen again on March 25, 2011, by Dr. Haque, complaining of feeling strange, dizzy, and lightheaded. Tr. at 532. On March 28, 2011, Plaintiff returned and reported that the nausea and vomiting were not getting better and that he felt dizzy. On this occasion Elizabeth Gudgel, ARNP, recommended that Plaintiff should return to the University of Iowa for treatment of hepatitis C. Tr. at 521–22.

On June 21, 2011, Plaintiff was seen at the University of Iowa to have a tooth pulled. Tr. at 531–39. While at the clinic, Plaintiff slipped on a wet floor in the rest room. He as examined to make sure he did not injure his left knee. Tr. at 536–39.

ADMINISTRATIVE HEARING

Plaintiff appeared at an administrative hearing on August 4, 2011. Tr. at 30–68. Plaintiff testified that he was no longer able to drink alcohol because alcohol interfered with his medication and made him very sick. Tr. at 34–35. Plaintiff testified that he is unable to work because of the injury to his neck. Tr. at 35. He said he has pain in his hands, arms, legs and feet, but the pain in his hands is the worst. Tr. at 36. Plaintiff said the medication he takes for pain, causes him to be sleepy and confused. Tr. at 37. When Plaintiff was

asked about other problems, he said that he had lost a lot of strength. Tr. at 41.

Plaintiff explained to the ALJ that he had worked all his life, but had never worked at any jobs where taxes had been withheld, and he had not paid taxes on his earnings. As a result, he did not have an earnings record. Tr. at 43–44. Plaintiff testified that he lived in a tent by a river. Tr. at 45. He said that he receives food stamps. Tr. at 46. He said that he was not able live at a shelter because they require that people get up at 5:30 and leave to look for work. He's not able to get up that early because of his medication. As a result, he is not able to stay at the shelter. Tr. at 50.

Plaintiff testified that his hands are very painful. He said the pain is a constant, steady burning. Tr. at 53. He said that touching his hands, even if he touches them, is very painful and sends pain up his arms. Tr. at 54.

After Plaintiff testified, the ALJ called George Brian Paprocki to testify as a vocational expert. Tr. at 58. In response to hypothetical questions which mirror the ALJ's residual functional capacity finding, the vocational expert identified the jobs cited in the Notice of Decision. The vocational expert testified that if a hypothetical individual is unable to attend work on a regular basis, or if the individual is unable to work without lengthy and frequent rest periods, then competitive work is not possible. Tr. at 64–65.

## DISCUSSION

We will affirm the ALJ's decision "[i]f the ALJ's findings are supported by substantial evidence on the record as a whole," an inquiry that requires us to consider evidence in the record that detracts from the ALJ's decision. *Wagner v. Astrue*, 499 F.3d 842, 848 (8th Cir. 2007). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." *Reutter ex rel. Reutter v. Barnhart*, 372 F.3d 946, 950 (8th Cir.2004).

We will not reverse the ALJ's "denial of benefits so long as the ALJ's decision falls within the 'available zone of choice.'" *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir.2008). The decision of the ALJ "is not outside the 'zone of choice' simply because we might have reached a different conclusion had we been the initial finder of fact." *Id.* (quoting *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir.2007)). Rather, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir.2005).

*Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir.2008.) In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

█ Plaintiff first argues that the case should be remanded for a proper evaluation of a mental impairment. The Court disagrees. Neither in his application nor at the hearing did Plaintiff allege he is disabled by a mental impairment of any kind. The claim of a mental impairment, therefore, is waived. *See Anderson v. Barnhart*, 344 F.3d 809, 814 (8th Cir.2003), quoting, *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir.1996). These cases state that the ALJ is under no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability. In this case, Plaintiff's claim for disability

stems from the injury to his spinal cord. While it is true that Plaintiff's history is replete with alcoholism, his claim for disability was based on physical injury rather than alcoholism or any other mental impairments. The ALJ found that alcoholism was not a severe impairment, and Plaintiff testified that he did not drink because alcohol interfered with the medication prescribed by his physicians. There is no substantial evidence contrary to Plaintiff's testimony in this regard or to the ALJ's finding. The case will not be remanded on this basis.

In *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir.1982)(en banc), the Court wrote: "Probably the most important issue will be the question of RFC ..." The Court went on: "The RFC that must be found ... is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." While an ALJ is charged with determining a residual functional capacity based on all the evidence, it is a medical question and must be supported by some medical evidence. *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001). Residual functional capacity is determined at step 4 of the sequential evaluation and it is Plaintiff's burden to come forward with evidence to establish it. In *Masterson v. Barnhart*, 363 F.3d 731, 737–38 (8th Cir. 2004), the Court wrote:

> Although the ALJ "bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence," *Roberts v. Apfel*, 222 F.3d 466, 469 (8th Cir.2000), we have also stated that a "claimant's residual functional capacity is a medical question," *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir.2001). "[S]ome medical evidence," *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir.2000)(per curiam), must

support the determination of the claimant's RFC, and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace[.]" *Nevland v. Apfel*, 204 F.3d 853, 855 (8th Cir.2000). In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional. *See* 20 C.F.R. § 404.1545(c); *Baldwin v. Barnhart*, 349 F.3d 549, 556 [ (8th Cir. 2003) ] (internal citation omitted).

■ In the case at bar, the Court has searched the record for substantial evidence in support of the ALJ's finding that Plaintiff has a residual functional capacity to work as set forth in *McCoy v. Schweiker*. None of the doctors who have treated or examined Plaintiff have indicated that he is able to work. On the other hand, Plaintiff's long time treating physician, Vinay Satti, M.D., conducted a disability physical and used a residual functional capacity form to report his conclusions. Dr. Satti's opinion is uncontradicted in this record. Contrary to the Commissioner's argument, Dr. Satti's opinion is consistent with the other medical evidence in the record, including his own treatment notes.

It is undisputed that Plaintiff injured his spinal cord. Objective evidence, in the form of the MRI taken October 12, 2010, showed swelling of the spinal cord and disc osteophyte at C5–C6 causing moderate canal stenosis. The doctors at the University of Iowa made note of Plaintiff's pain and weakness. They also noted Plaintiff's difficulty walking and inability to balance himself. The medical records establish that Plaintiff continues to have constant burning pain in his hands, arms, legs and feet. Although the medication provides some relief for the pain, it makes him sleepy and dizzy. According to Dr. Satti, as well as Plaintiff's own testimony, the

side effects of the medication interfere with the ability to maintain attendance at work.

The case at bar is another case which brings to mind the statements of the Court of Appeals in the case of *Rhines v. Harris,* 634 F.2d 1076, 1079 (8th Cir.1980): "Employers are concerned with substantial capacity, psychological stability, and steady attendance; they will not unduly risk increasing their health and liability insurance costs. It is unrealistic to think that they would hire anyone with the impairments of this claimant." As the Court pointed out, the Commissioner need not find a specific job for a claimant, but it must be shown that the claimant can realistically perform in existing employment. As in *Rhines,* the Commissioner has failed to do so in this case. The vocational expert testified that if Plaintiff is unable to maintain regular attendance, or if he requires frequent rest periods during work hours, then competitive work is not possible.

In the opinion of the Court, Plaintiff proved his case with medical evidence and is entitled to the benefits for which he applied. A remand to take additional evidence would do nothing other than delay the receipt of benefits to which Plaintiff has proved he is entitled. *See Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir. 1987).

## CONCLUSION AND DECISION

The Court has considered the evidence which supports, as well as the evidence which detracts from the decision made by the ALJ. After applying the balancing text noted in *Gavin v. Heckler,* 811 F.2d at 1199 (8th Cir.1987), and cases cited therein, this Court holds that the final decision of the Commissioner is not supported by substantial evidence on the record as a whole. This case is reversed and remanded for an award of benefits.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See also, McDannel v. Apfel,* 78 F.Supp.2d 944 (S.D.Iowa 1999) (discussing, among other things, the relationship between the EAJA and fees under 42 U.S.C. § 406B), and LR 54.2(b) [3]. *See also, Gisbrecht v. Barnhart,* 535 U.S. 789, 122 S.Ct. 1817, 1821, 152 L.Ed.2d 996 (2002); *Mitchell v. Barnhart,* 376 F.Supp.2d 916 (S.D.Iowa 2005).

IT IS SO ORDERED.

---

**3.** N.B. Counsel is reminded that LR 54.2(b), states that an EAJA application "must specifically identify the positions taken by the government in the case that the applicant alleges were not substantially justified."