Kenneth L. NALLEY, Jr., Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 4–99–CV–90082.

United States District Court,
S.D. Iowa,
Central Division.

March 2, 2000.

Danny C. Wilmoth, Des Moines, IA, for
plaintiff.

Gary L. Hayward, Assist. U.S. Atty.,
Des Moines, IA, for defendant.

ORDER

PRATT, District Judge.

Plaintiff, Kenneteh L. Nalley, Jr., filed a
Complaint in this Court on February 16,
1999, seeking review of the Commission-

er's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, 1381 *et seq.* This Court may review a final decision by the Commissioner. 42 U.S.C. § 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

Plaintiff filed applications for benefits on June 19, 1996[1]. Tr. at 457–59 and 633–36. After the application was denied initially and upon reconsideration, Plaintiff requested a hearing before an Administrative Law Judge. A hearing was held before Administrative Law Judge Thomas M. Donahue (ALJ) on August 29, 1997. Tr. at 42–92. The ALJ issued a Notice of Decision—Unfavorable on October 21, 1997. Tr. at 12–30. The ALJ's decision was affirmed by the Appeals Council on December 11, 1998. Tr. at 7–9. A Complaint was filed in this Court February 16, 1999.

Plaintiff was admitted to South Barry County Hospital on July 23, 1994, for treatment of viral pneumonitis with secondary hypoxia. Tr. at 177. It was noted that six years prior to this hospitalization, Plaintiff has suffered a central nervous system trauma resulting in multiple surgeries and subsequent seizures. Tr. at 176.

On November 8, 1994, Plaintiff was admitted to the hospital with a diagnosis of acute drug overdose. Plaintiff was described as a "confused, paranoid acting male who cries intermittently, talks about things crawling out of his skin and is in distress secondary to paranoia." It was thought that Plaintiff had been using a mixture of cocaine and methamphetamine. Tr. at 204.

Plaintiff was seen at the emergency room of the hospital on numerous occasions between January 6, 1993 and February 6, 1995. Tr. at 237–381. Although each of the pages was reviewed, each entry will not be discussed here.

On December 10, 1994, Plaintiff was admitted to the hospital "because of possible status epilepticus." While he was in the hospital, he had several spells. There were no focal neurological findings, and all tests were unremarkable.

On December 11, 1994, it was suspected that he had another spell that morning. He was found to be thrashing around the oxygen bag and other peculiar positions. No tongue biting, no incontinence of urine. Tongue was clear; no evidence of tongue biting. During the spell, he again responded to command quite well. There was no post-spell confusion or disorientation. His studies were all negative.

On discharge, the diagnoses included pseudoseizure or conversion reaction, and Plaintiff was advised to have a psychiatric evaluation. Tr. at 396.

Plaintiff saw George Wong, Jr., M.D. for a neurological examination February 16, 1995. Tr. at 411–12. An electroencephalographic report, dated February 23, 1995, was normal according to Dr. Wong. Tr. at 414. Plaintiff saw C. Bret Bowling, M.D. of Monett Family Medicine, on February 28, 1995. Dr. Bowling wrote that Plaintiff suffered from a life long seizure disorder, although "he had not had any seizure until last year when he was involved in an accident where he had some facial fractures and had to have a place put on the left side of his jaw and his left cheek. Patient then started having generalized seizures again." The doctor also mentioned a history of asthma which was controlled with medication. Tr. at 424.

Plaintiff saw Andrew J. Fritsch, M.D. on April 3, 1995. Tr. at 427–33. Plaintiff

---

1. Plaintiff filed a previous Application for Title II benefits February 23, 1995. Tr. at 140–43. On this application, Plaintiff claimed an onset of disability of August 27, 1993. Tr. at 140. This application was denied initially, and again on reconsideration on August 24, 1995. It does not appear that Plaintiff requested a hearing. On his June 19, 1996 application, Plaintiff said that he became disabled October 5, 1995. Plaintiff, therefore, did not request that the earlier application be reopened.

reported that on August 27, 1993, his ex-brother-in-law beat him with a baseball bat in order to steal his money. Since that time, Plaintiff said that he has no vision in his right eye, no hearing in his right ear, and that he has severe recurring headaches, some decrease in his memory and at times has difficulty speaking. He said that his words get jumbled, particularly if he speaks too fast or gets excited. Following the beating, Plaintiff said, he was in a coma for five days. Plaintiff said that since the beating, he has had approximately two seizures per week, and that he has been short tempered and depressed. He also complained of bilateral tinnitus. Plaintiff complained of severe vertigo since the beating. He said that he does reasonably well sitting in a chair, but that when he is walking, if he turns his head, the room will spin. Plaintiff also reported that he had been depressed since the beating. Plaintiff said that because of his asthma, if he walks five hundred feet, he becomes short of breath and begins to wheeze. Plaintiff told the doctor that in 1994, he had a seizure while driving, and that he has had severe back pain since. Tr. at 427. On physical examination, Plaintiff was described as "a slender white male in no acute distress with an obvious right facial paralysis, who appears moderately depressed." The doctor observed "multiple tatoos over the chest, back, shoulders, and thighs." Tr. at 428. After his examination, Dr. Fritsch diagnosed:

1. Post traumatic brain deficit resulting in:

  A. Right sided blindness except for ability to detect light,

  B. Right sided deafness,

  C. Right facial paralysis,

  D. Occasional slurring or jumbling of words,

  E. Severe labyrinthine dysfunction resulting in severe vertigo with head turning while walking.

2. Probable active peptic ulcer.

3. Probable irritable bowel syndrome.

4. Moderately severe clinical depression.

5. Idiopathic seizure reaction (epilepsy).

6. Post traumatic back pain with herniated lumbar disc to be excluded.

7. History of genital herpes—in remission.

8. Bronchial asthma under treatment.

Tr. at 429.

Plaintiff was seen for a psychological evaluation April 4, 1995, by Robert McDermid, Ph.D. Tr. at 434–37. Dr. McDermid wrote:

> Kenneth was born in Wilson, North Carolina, but was raised in Southwest Missouri from age 10 on. Kenneth said his father was a habitual criminal and he dragged the family all across the United States as a result of his various schemes and in running away from the law. Kenneth said his father also used to beat his mother, his younger brother, and Kenneth. Kenneth said that his mother divorced their father while he was in prison and sent the children to live with their grandmother in Maine in order to stay away from his father. Kenneth said that the children and his mother were fearful he would try to track them down after he got out of prison. Kenneth said after awhile his mother showed up to claim both of the boys. Kenneth said that his mother had remarried and taken up truck-driving and was driving as a team driver with her husband. They were living in Southwest Missouri. His grandmother moved in with the boys so she could take care of the boys while his mother and stepfather were on the road. Kenneth said his parents were on the road most of the time.

Tr. at 434. The psychologist related what Plaintiff told him about the beating incident:

> Kenneth said that his brother-in-law moved out suddenly one day, and when he did, Kenneth's TV, VCR, video

games, and other possessions were gone. When Kenneth went out to see his wife and children, this brother was there and he treated them fairly decently. However, when Kenneth's back was turned, he said his brother-in-law beat him over the head with a baseball bat. Kenneth said witnesses from across the street said it was clear that this person's intent was to kill him because he did not stop.

Kenneth said he does not recall the incident but has imagined it in his head numerous times. He said he continues to have nightmares of how he imagines it happening. When he came to, he could not tell the difference from where his shoulders began and his neck began and there was one continuous mass of swollen flesh running all the way to the top of his head. He said he could not recognize himself and he was told by numerous people that he was lucky to have lived. Kenneth said that his brother-in-law claimed self-defense and plea bargained. Kenneth said that he could not believe the court would allow this and said that he would take the law into his own hands if he ever got the opportunity. As noted above, Kenneth said he has been unable to work and experience a great deal of pain and discomfort as a result of his injuries. He said he is blind in one eye and deaf in one ear as a result of the trauma.

Tr. at 435–36. After a mental status examination, Dr. McDermid diagnosed, on Axis I, post traumatic stress disorder, and on Axis II, dependent personality traits. The Axis V diagnosis was 50. Tr. at 437.

Plaintiff was admitted to Mercy Hospital in Des Moines, Iowa on October 16, 1995, after having been transferred from the Green County Hospital (Tr. at 537–38), for treatment of acute paraplegia. Plaintiff reported that he had injured his back at work on October 5, 1995, lifting a hundred pound object. Plaintiff said that after lifting the object, he lost his balance and fell back-wards against a table, striking his mid dorsal area. On October 16, Plaintiff

"got up to go to the bathroom to get a drink of water and lost sensation in his legs so his legs folded, and he fell on the floor. He apparently was incontinent of urine at that time and has not been able to feel any-thing from the umbilicus down." Tr. at 494. During this hospitalization, Plaintiff was seen by psychiatrist Rick Turner, M.D. who felt Plaintiff had a conversion disorder due to his many stressors with depressive/anxiety component present. Tr. at 495. In his report, Dr. Turner noted that there were many inconsistencies in Plaintiff's symptoms which led him to consider the diagnosis of conversion disorder. For example, Dr. Turner noted that Plaintiff had normal deep ten-don reflexes as well as normal anal tone. Plaintiff did not have any incontinence during the hospitalization, and he was able to sit with his legs crossed, and to keep his legs midline when his hips and knees were flexed. "All of these features do not usually happen with true flaccid paraplegia." Tr. at 498. Interestingly, Dr. Turner's report does not contain any discussion of the beating Plaintiff underwent at the hands of his ex-brother-in-law. Dr. Turner's Axis I diagnosis was: "Adjustment disorder with depressed mood and also conversion disorder as provisional diagnosis." Tr. at 499.

On October 27, 1995, Dr. Meilahn wrote Plaintiff did not have any pathology in his back or spinal cord, and should not, therefore, be receiving narcotic medication. Rather, wrote the doctor, he should seek mental health care. Tr. at 518.

When Plaintiff was seen at the Green County Medical Center on December 1, 1995, for treatment of left shoulder pain, it was noted that he was in a wheelchair. Tr. at 526. On November 29, 1995, Kenneth R. Friday, M.D. diagnosed Plaintiff's shoulder problem as "recurrent inflammatory bursitis". Tr. at 558. On November 24, 1995, Plaintiff saw Dr. Friday for stomach problems which were diagnosed as

acute gastroenteritis with hyperacidity. Tr. at 559. In a letter dated March 28, 1997, Dr. Friday attributed Plaintiff's problems with his shoulders (by then the shoulder problem was bilateral) and his stomach to being confined to the wheelchair. In the March 28, 1997 letter Dr. Friday also states that the side effects of Plaintiff's medication include drowsiness, intermittent nausea and interference with thinking. Tr. at 617. On January 22, 1996, Dr. Friday wrote to the Iowa Department of Transportation that Plaintiff meets the definition of handicapped in the Iowa Code so as to qualify for a handicapped parking permit. Tr. at 533.

On August 27, 1996, Plaintiff was seen for a neurological examination by Steven R. Adelman, D.O. Tr. at 585–87. After his examination, Dr. Adelman wrote that although Plain-tiff's symptoms were somewhat atypical, the objective findings of mildly hyperreflexia in the lower extremities suggest an organic basis for Plaintiff's symptoms. Tr. at 586. After his examination, Dr. Adelman opined that Plaintiff would be limited to lifting 20–30 pounds, and that he would be unable to stand or walk but that he could sit through an eight hour work day. Dr. Adelman wrote: "He has no impairment of handling objects, seeing, hearing, speaking, or traveling." Tr. at 587.

Plaintiff saw James L. Gallagher, M.D. on September 4, 1996, at the request of Disability Determination Services. Tr. at 588–90. Dr. Gallagher did not find sufficient evidence to make a diagnosis of a conversion disorder, and suggested that a physical rather than psychiatric reason should be considered as the source of Plaintiff's disability. Dr. Gallagher opined that Plaintiff was capable of appropriate interaction with supervisors and co-workers and that Plaintiff was not cognitively impaired. Tr. at 590. On October 14, 1996, Dr. Gallagher wrote a follow-up letter in which he stated: "Given Dr. Turner's information of 10–17–95, the diagno-

sis of Conversion Re-action is very likely. The physical symptoms seemed rather inconsistent." Tr. at 602.

Plaintiff was seen by Philip L. Ascheman, Ph.D. on November 7, 1996, at the request of Disability Determination Services. Tr. at 603–06. Dr. Ascheman indicated that he reviewed the consultation reports by Dr. Turner, Dr. Gallagher and Dr. Adelman. Tr. at 603. Plaintiff was given a Minnesota Multiphasic Personality Inventory—2 to take but the results were invalid. Tr. at 605–06. After interviewing Plaintiff[2], Dr. Ascheman stated that he concurred with Dr. Gallagher's first opinion that Plaintiff did not show evidence of a conversion disorder. Dr. Ascheman also opined that Plaintiff was not showing evidence of depression, anxiety or cognitive psychological impairment. Tr. at 606.

Plaintiff saw Thomas Greenwald, M.D. on March 25, 1997, because of bilateral carpal tunnel-like symptoms. Dr. Greenwald observed that Plaintiff had been using a wheelchair for a year and a half, and had been using his arms and hands to push the wheels and to get in and out of the chair. Dr. Greenwald recommended cock-up splints to relieve the pain. Dr. Greenwald also examined Plaintiff for complaints of left shoulder pain. According to Dr. Greenwald, Plaintiff had positive impingement signs with pain on resisted supraspinatus activity. Tr. at 616.

In a report dated March 28, 1997, Dr. Friday certified that Plaintiff was wheelchair bound due to traumatic paraplegia. The doctor stated that although Plaintiff initially showed very slight neurologic improvement with medication and physical therapy, "he has lost all of those few suggestions of improvement, and is totally paraplegic, being wheelchair bound." Among the problems identified because of being confined to the wheelchair, Dr. Friday stated, were progressive muscular

---

**2.** Although Dr. Ascheman interviewed Plaintiff, he does not indicate that he administered a mental status exam.

wasting of both legs, progressive complications in the shoulders and both arms from having to propel the wheelchair, and severe gastritis which limits the available medications to control pain. Dr. Friday stated that the side effects of Plaintiff's current medications were drowsiness, intermittent nausea and interference with thinking. Dr. Friday opined that Plaintiff would not be able to maintain any employment because of his physical and mental status. Tr. at 617. Dr. Friday's treatment notes complete the medical evidence in this record. Tr. at 618–32.

At the hearing of August 29, 1997, after Plaintiff and his wife had testified, the ALJ called Jack Reynolds to testify as a vocational expert. Tr. at 87. The ALJ asked the following hypothetical:

> I'd like to ask you a hypothetical question, Mr. Reynolds. It'd be age 24, male, GED, past relevant work set forth in Exhibit 7–E, the ability to lift up to 10 lbs. occasionally and frequently, sitting eight of an eight-hour day with consideration for normal rest breaks in eight hours during a work day with no positional changes. The claimant mentioned limitation of carpal tunnel. I would give you as I saw the claimant take the arm off his chair and take, take his boot off with relative ease. I would like you to consider that limitation if there was any that you just saw. Based on this hypothetical, could the claimant do any of his past relevant work?

Tr. at 87–88. In response the vocational expert testified that Plaintiff would not be able to do any of his past relevant work, but that he would be able to do some unskilled work examples of which included information clerk, security system monitor, and interviewing clerk. Tr. at 88. In response to a question from Plaintiff's attorney, the vocational expert testified that the side effects from Plaintiff's medication, identified by Dr. Friday, would preclude competitive work activity. Tr. at 91.

In his decision of October 21, 1997, the ALJ found that Plaintiff is unable to do his past relevant work, that he has a residual functional capacity consistent with the hypothetical recited above (Tr. at 25), and that Plaintiff is able to do jobs such as those identified by the vocational expert. The ALJ held, therefore, that Plaintiff is not disabled nor entitled to the benefits for which he applied. Tr. at 26.

## DISCUSSION

The scope of this Court's review is whether the decision of the Secretary in denying disability benefits is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g). *See Lorenzen v. Chater,* 71 F.3d 316, 318 (8th Cir.1995). Substantial evidence is less than a preponderance, but enough so that a reasonable mind might accept it as adequate to support the conclusion. *Pickney v. Chater,* 96 F.3d 294, 296 (8th Cir.1996). We must consider both evidence that supports the Secretary's decision and that which detracts from it, but the denial of benefits shall not be overturned merely because substantial evidence exists in the record to support a contrary decision. *Johnson v. Chater,* 87 F.3d 1015, 1017 (8th Cir.1996) (citations omitted). When evaluating contradictory evidence, if two inconsistent positions are possible and one represents the Secretary's findings, this Court must affirm. *Orrick v. Sullivan,* 966 F.2d 368, 371 (8th Cir.1992) (citation omitted). *Fenton v. Apfel,* 149 F.3d 907, 910–11 (8th Cir.1998).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel,* 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger,* 522 F.2d 13, 16 (8th Cir.1975).

In the case *sub judice,* the ALJ found that Plaintiff is unable to do any of his past relevant work. The burden of proof, therefore, was shifted from Plaintiff to the Commissioner to prove with medical evi-

dence that Plaintiff has a residual functional capacity to do other kinds of work, and that other work exists in significant numbers that Plaintiff can perform. *Nevland v. Apfel*, 204 F.3d 853 (8th Cir.2000) citing *McCoy v. Schweiker*, 683 F.2d 1138, 1146–47 (8th Cir.1982)(en banc); *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir. 1983).

■ In the case at bar, the medical evidence establishes that Plaintiff suffered a severe head injury when he was beaten with a baseball bat by his ex-brother-in-law. The evidence establishes that this injury left him blind in one eye and deaf in one ear. We know from the medical evidence that in October of 1995, a few days after an object fell on his chest and pushed him backwards, Plaintiff lost feeling in his legs and has been confined to a wheelchair ever since. The medical evidence also tells us that Plaintiff has a history of a seizure disorder. We do not know if there is any cause and effect relationship between these events because none of the doctors who treated or examined Plaintiff were afforded the opportunity to review all of the available medical records, and none seem to have known the totality of Plaintiff's medical history. The Court would remind the Commissioner that it has been the law in this jurisdiction for some time that when a claimant is sent to a doctor for a consultative examination, all the available medical records should be reviewed by the examiner. *Mateer v. Bowen*, 702 F.Supp. 220, 222 (S.D.Iowa 1988) ("Furthermore, the court would indicate to the Secretary that it should always provide all medical records to any physician from whom he solicits an opinion regarding any social security case.") This admonition applies with equal force to Disability Determination Services just as it does to the ALJs.

In addition to the aforementioned, we also know from the medical evidence that the side effects of Plaintiff's medication cause drowsiness, nausea, and an inability to concentrate. When the side effects of the medication were presented to the vocational expert on cross examination, he testified that competitive work would not be possible.

■ In order to constitute substantial evidence upon which to base a denial of benefits, a vocational expert testimony must be in response to a hypothetical question which captures the concrete consequences of the claimants severe impairments. *Taylor v. Chater*, 118 F.3d 1274, 1278–79 (8th Cir.1997). A hypothetical question must include the side effects of medication if, as here, such is supported by the medical evidence in the record. *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir.1997). The side effects of Plaintiff's medication were clearly established by Dr. Friday. The ALJ's hypothetical was defective because it did not include consideration of the side effects of Plaintiff's medication. In addition to the side effects of medication, the ALJ also neglected to mention Plaintiff's inability to see in his right eye, hear in his right ear, or the occasional slurring of speech diagnosed by Dr. Fritsch. The failure to mention these limitations renders the ALJ's hypothetical defective. The response thereto, therefore, does not constitute substantial evidence supporting the ALJ's decision.

■ The ALJ's hypothetical is defective in another respect. The ALJ asked the vocational expert to consider the effect of Plaintiff's carpal tunnel syndrome and rotator cuff injury, based upon the ALJ's observation of Plaintiff adjusting the arm of his wheelchair and Plaintiff removing a boot from his foot. In the first place, the impairments were established by medial evidence. In the second place, neither the ALJ nor the vocational expert are medical experts. It is error for an ALJ to ask a vocational expert to interpret the medical evidence or to base testimony on the expert's own observations. *Baugus v. Secretary of Health and Human Services*, 717 F.2d 443, 447 (8th Cir.1983) (A vocational expert cannot be expected to assume the

evidence and testimony and then state an opinion as to whether a claimant has residual skills that can be transferred to other occupations. The result of such a procedure is to require vocational experts to make credibility findings, weigh and balance conflicting evidence, and interpret often complicated medical documents and testimony.) Finally, as Judge Heaney wrote in *Lanning v. Heckler*, 777 F.2d 1316 (8th Cir.1985): "This Court and the United States Department of Justice have agreed that the ALJ may not reject a claimant's subjective complaints solely on the basis of personal observations. *Polaski v. Heckler*, 739 F.2d 1320, 1321–22 (8th Cir.1984)."

■ In the case at Bar, the Commissioner did not meet his burden of proving either that Plaintiff has the residual functional capacity to work or that jobs exist that he is able to do in his impaired condition. In *Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir.1987), the Court held that where the medical evidence in the record overwhelmingly supports a finding of disability, remand is unnecessary. The vocational expert testified that the side effects of Plaintiff's medication render competitive work impossible. As in *Gavin*, a remand in this case would be a "futile gesture" which would serve only to delay the receipt of benefits to which Plaintiff is clearly entitled. An order to award benefits, therefore, is hereby entered.

### CONCLUSION AND DECISION

It is the holding of this Court that Commissioner's decision is not supported by substantial evidence on the record as a whole. The Court finds that the evidence in this record is transparently one sided against the Commissioner's decision. *See Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987). The evidence in this record does not establish that Plaintiff has the ability to return to past relevant work or to any other type of work that exists in significant numbers in the national economy. A remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. Therefore, Plaintiff is entitled to disability benefits.

Defendant's motion to affirm the Commissioner is denied. **This cause is remanded to the Commissioner for computation and payment of benefits.** The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer*, 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993). *See also, McDannel v. Apfel*, 78 F.Supp.2d 944 (S.D.Iowa 1999).

IT IS SO ORDERED.