334 F.Supp.2d 1141 (2004)
Izetta F. SPARKS, Plaintiff,
v.
Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.
No. 4:03 CV 1027 DDN.
United States District Court, E.D. Missouri, Eastern Division.
August 12, 2004.
*1142 Lee C. McMurray, McMurray P.C., St. Louis, MO, for Plaintiff.
Raymond W. Gruender, III, Suzanne J. Gau, Office of U.S. Attorney, St. Louis, MO, for Defendant.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying plaintiff Izetta F. Sparks's applications for a period of disability and disability insurance benefits under Title II of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. The parties consented to the exercise of plenary jurisdiction by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).

I. BACKGROUND
A. Plaintiff's application
On April 25, 2000, plaintiff applied for benefits, relating the following in her application *1143 and supporting materials. She was born in January 1964 and has an eighth-grade education. She became unable to work on April 17, 2000, because of a stroke, which had affected her left arm and hand, lifting ability, balance, and speech. Two months before her stroke, she began experiencing pain that limited her activities. Once a week she had pain in her head, for which she took Tylenol, and three times per week she had pain in her arm and hand. She could stand, walk, bend, and use her left hand for only 30 minutes before her symptoms would occur. Her symptoms occurred after 1 hour of standing. She also had difficulties kneeling, squatting, stair climbing, and reaching. Moreover, she had "slow dragging speech," lost memory, forgetfulness, and some confusion. She could no longer perform daily activities such as lifting, mopping, sweeping, walking long distances, cooking, and shopping. She could still wash dishes and wipe off kitchen appliances. (Tr. 39, 58, 64, 80-83.)
In the previous 15 years plaintiff held cashier jobs at "department store Wal [-]Mart," a hardware store, restaurants, and grocery stores. In addition to other low-paying positions, she had also worked as a dental assistant and, for an unspecified time period,[1] as a shoe salesperson at Stride Rite.[2] Describing her work at Wal-Mart, plaintiff checked boxes on a form to indicate that she had to lift up to 50 pounds (dog food), and frequently lifted 25 pounds. FICA earnings records show that since 1984 plaintiff never earned more than $7,000 in a year, often earned less than $5,000 per year, and earned less than $1,000 during several years. In 1992, she earned $109.25 at Walgreens. In 1996, she earned $2237.51 at Youthful Shoes, Inc. (Tr. 43, 52, 54, 59, 71-77, 95.)
B. Plaintiff's medical records
On April 18, 2000, plaintiff went to the emergency room at St. Joseph Health Center, complaining of slurred speech and left-side weakness. A neurology consult was obtained. (Tr. 235-36.)
On May 2, 2000, David Glick, M.D., diagnosed plaintiff with a stroke secondary to basilar migraine. He listed her symptoms as "stroke [with] dysarthria[3] and mild [left] hemiparesis," which another doctor thought was a complicated migraine. He noted that her Magnetic Resonance Imaging (MRI) was essentially normal and that she had not been checking her blood sugar regularly; the last time it was about 200. Finally, he recommended new migraine prophylaxis and changing her diabetes medications. Subsequently, he indicated that she was undergoing physical and speech therapy and that her overall prognosis was good; however, he stated that short-term disability status was reasonable and that re-evaluation should take place monthly. (Tr. 151, 155.)
On May 11, 2000, plaintiff told Dr. Glick that she wanted to "work again now." Her blood sugar measurements had been in the 200s to 300s, and she reported nausea, weakness, and poor sleep. She was being evicted from her apartment and was attempting to quit smoking. Her moderate frontal headaches responded to Tylenol. She had been taking Glucophage "on [an] empty stomach"; he advised her to take it with food and not to skip meals. *1144 He prescribed Ambien for her "situational/multifactorial" insomnia. She was started on insulin injections for diabetes. (Tr. 158-59, 161.)
On May 16, 2000, Dr. Glick observed that plaintiff had "much improved in last week." She had improved blood sugar, improved insomnia, and resolved nausea, and she was taking medications and insulin as prescribed. She was experiencing occasional frontal headaches but no migraine-like headaches. (Tr. 164.)
On June 1, 2000, plaintiff was discharged from speech therapy after completing six of eight authorized sessions. She had made significant improvements but still had concentration and recollection problems. (Tr. 268.)
Neurologist Edward Eyerman, M.D., evaluated plaintiff on June 1, 2000. He indicated that in the previous week she had three episodes of what sounded like complex partial seizures. He was also informed that she was having episodes of uncontrollable myoclonus in the face and her mouth would draw up uncontrollably on the left in a "sneerlike" movement that might last for 30 seconds. He had not seen her MRI but suggested she was having post-infarct seizures. He proposed placing her on Aggrenox and Carbitrol. (Tr. 291-92.)
On June 16, 2000, Dr. Glick indicated that plaintiff's left-sided weakness and mild dysarthria had almost completely resolved with physical and occupational therapy and noted that an antidepressant for migraine prophylaxis had been discontinued due to severe side effects. He also noted that she had not taken the medications recommended by Dr. Eyerman. (Tr. 166.)
On July 15, 2000, plaintiff was examined by Daniel Clerc, M.D., who assessed her with sinusitis. Reviewing her chart, he determined that her clinical condition had deteriorated significantly since 1992, but he believed she had a good chance to seek gainful employment, depending on her progress over time. (Tr. 169.)
On July 26, 2000, plaintiff was seen at the Lincoln County Memorial Hospital emergency room. The diagnosis was partial seizures and non-compliance with medications. A computer tomography (CT) scan of her head yielded negative results. (Tr. 300, 306.)
On October 18, 2000, Timothy Miller, M.D., saw plaintiff and conducted a neurological examination. Her chief complaints were stroke, diabetes mellitus, and a history of migraine headaches. She informed him that, after release from the hospital post-stroke she still had slurred speech, left-arm and leg weakness, and diminished dexterity. Her speech was mildly dysarthric[4] and her language function was normal. Motor examination revealed normal tone and bulk, with full strength in all extremities. Gait examination showed normal heel, toe, and tandem walking, but her ambulation was quite slow and slightly unsteady. He found that she had residual mild language deficits and decreased perception of left-side dexterity. (Tr. 309-12.)
A head CT on July 23, 2001, revealed bifrontal subcortal white matter hypodensity. Therefore, an MRI was obtained. It revealed an abnormal signal intensity in the right-sided corona radiata,[5] which the radiologist believed could represent plaque or a small vessel ischemic disease. (Tr. 328-29.)
*1145 On March 15, 2002, Duane Turpin, DO, conducted a consultative examination of plaintiff for disability determination. He found her logic, reasoning, insight, thought, context, and fund of knowledge to be within normal bounds. He noted that she had good motor strength and no atrophy but mild ataxia[6] on the left. He was not convinced that her stroke had resulted from a migraine headache. He concluded that, although she had sustained some left-sided symptoms as a result of the stroke, her residual deficits were small and she should be able to perform some type of work-related activity, such as standing, walking, speaking, and performing other activities with both sides of the body. He suggested she avoid physically demanding occupations as well as those involving driving or precarious positions. A Residual Functional Capacity (RFC) form he completed indicated left-sided exertional limitations, including upper-extremity pushing and pulling limitations; postural limitations, e.g., no climbing; manipulative limitations, i.e., only occasional reaching, handling, fingering, and feeling on the left side; and environmental limitations regarding hazards. (Tr. 332-33, 335-38.)
On April 29, 2002, licensed psychologists Peggy R. Goldwater, M.A., and Herbert Goldman, Ph.D., conducted a neuropsychological evaluation of plaintiff. Among the battery of tests administered was the Wechsler Adult Intelligence Scale  Third Edition (WAIS-III), which showed intelligence quotient (IQ) scores of 76 (verbal), 76 (performance), and 74 (full scale), indicating borderline intellectual functioning. In addition, plaintiff's achievement scores ranged from borderline to low-average ranges, her memory and learning indices were borderline to low average, and attention test results were low average or average. Psychomotor speed, a measure of one's ability to process simple routine visual information quickly and efficiently, and to perform tasks quickly based on that information, was in the low-average range. Further, she exhibited left-sided motor weakness, left-sided sensory "imperception," very slight dysarthria, and mild word-finding problems. The evaluation noted that "overall there is no suggestion of significant neurocognitive decline, although her somewhat lower scores could be reflecting an inertia secondary to frontal lobe dysfunction." (Tr. 340-43.)
Dr. Goldman's impression included cognitive disorder, not otherwise specified (NOS), secondary to stroke; diabetes and hypertension with secondary stroke and seizure (per client report); and a Global Assessment of Functioning (GAF) of 50. He opined that plaintiff's plans to work as a cashier might be overly ambitious, unless in a retail store with very low volume. He felt that her health, problems with fatigue, and the stress of continuous performance demands in a timely manner would be major functional disabilities. He recommended a work evaluation with an interest inventory and on-site trials as a cashier or receptionist in a small office. (Tr. 343.)
On May 16, 2002, vocational expert (VE) James England, Jr., answered the first of three sets of interrogatories directed to him by the Administrative Law Judge (ALJ). In item 10, the VE was directed to identify (based on four specified exhibits) the jobs plaintiff had performed in the previous 15 years, to classify them in terms of exertional requirements and skill levels, and to identify any transferrable skills of plaintiff. The VE indicated, inter alia, that plaintiff had been a cashier, which was normally light and unskilled, *1146 but one of the positions she performed was medium and unskilled. The VE characterized plaintiff's retail shoe sales position as light, unskilled work. (Tr. 99, 102.)
In item 11, the VE was directed to consider a 41-year-old female with an eighth-grade education; limitations of frequent and occasional lifting of 20 pounds with the right upper extremity and 10 pounds with the left upper extremity; no standing, walking, and sitting limitations; limitations with pushing and pulling with the upper extremities to the weights described for lifting; the ability to climb ramps and stairs occasionally and the inability to climb ropes, scaffolds, or ladders; the abilities to balance, kneel, crouch, crawl, and stoop occasionally; a left upper extremity the use of which is slightly decreased for reaching, handling, fingering, and feeling due to slight clumsiness with rapid, alternating movements. The VE was then asked whether the claimant would be qualified to perform any of her past relevant jobs as (a) specifically performed by her, or (b) generally required by employers in the national economy. He responded that she would not be able to return to work as a dental assistant, a deli clerk, or a cashier in some positions, although "she still would be able to work as a parking lot cashier or as a cashier in a convenience store." The VE also believed "she could still work as a retail shoe sales person or in other retail sales positions of a similar nature." As to item 12, the VE did not believe that plaintiff's transferable skills acquired as a dental assistant would be of use because they required good bimanual dexterity. (Tr. 99, 102.)
On May 21, 2002, plaintiff's attorney asked the ALJ to reopen the record and admit and consider the results of plaintiff's Division of Vocational Rehabilitation testing (i.e., Dr. Goldman's evaluation). On June 12, having received the VE's initial interrogatory responses, plaintiff's attorney asked the ALJ to forward to the VE a hypothetical that included limitations by a 76 Verbal IQ, a 76 Performance IQ, and a 74 Full Scale IQ; writing at less than a fifth-grade level; a reduced memory capacity; a diagnosis of cognitive disorder secondary to stroke; and a GAF of 50. Plaintiff's attorney also indicated that, in the first set of responses, the VE had not provided a comparison to the Dictionary of Occupational Titles (DOT). The ALJ forwarded the June 12 letter to the VE, along with supplemental interrogatories 12 through 15, the latter two of which concerned the DOT. (Tr. 110-11, 113-15.)
On August 22, 2002, the VE responded to supplemental interrogatories 12 through 15, which added hypothetical information, and opined that plaintiff's transferable skills would remain of no use and that, taking into consideration the GAF of 50, it would not appear that such an individual would be capable of performing any type of work activity. Finally, the VE indicated that the interrogatories regarding the DOT were not applicable. (Tr. 116.)
On October 22, 2002, the ALJ directed the VE to assume, in addition to and in combination with the assumptions the ALJ originally made, "that the claimant would need a low stress work environment and a job that did not require her to meet strict industrial standards for pace or productivity, such as would be required in assembly-line jobs, wherein failure to keep pace would have an immediate impact on other work." On October 24, the VE responded that these additional limitations would not vary the VE's opinion expressed in the original interrogatories. The VE added that other positions, e.g., an office cleaner and motel/hotel maid, exist involving even less contact with the public and perhaps less stress for someone who feels more comfortable not working directly with the public and which are light and unskilled *1147 jobs. He stated that at least 3,000 of each of these positions exist in the St. Louis metropolitan area and that they are not performed on a strict-paced schedule and are not particularly stressful. (Tr. 119-20.)
C. The hearing testimony
On August 29, 2001, at the first of two hearings before the Administrative Law Judge (ALJ), plaintiff answered questions from the ALJ regarding her work history. As to the Stride Rite position plaintiff was asked only if she was a salesperson and how long she worked there. She answered the first question in the affirmative and stated that she worked there "[u]ntil they went out of business." She stated that she could no longer work because of her poor memory and problems with her speech, left side, arm and leg. She also stated that she had gone through speech and occupational therapy and that her doctor intended to send her back to therapy because of her left-side weakness. Plaintiff's brother also testified briefly. (Tr. 388-90, 402-06.)
On April 29, 2003, the ALJ held a supplemental hearing at which the VE testified. Most of the hearing entailed the ALJ, the VE, and plaintiff's attorney attempting to understand the flow of the numerous correspondences between the parties regarding the interrogatories.[7] The VE testified that the person described in Dr. Goldman's report, with a GAF of 50, would not be able to maintain regular work. The VE also confirmed that his October 24, 2002 response to the ALJ's third interrogatory correspondences encompassed the low stress and pace restrictions and not the information supplied by plaintiff's counsel regarding the GAF of 50. (Tr. 368-70, 373.)
D. The ALJ's decision
In a May 30, 2003 decision denying benefits, the ALJ found the following.[8] Plaintiff meets the Act's disability requirements and has not engaged in substantial gainful activity since April 17, 2000. She has severe impairments of history of stroke with cognitive disorder NOS, seizure disorder, and diabetes mellitus. She has no impairment or combination listed in or medically equal to one listed in the Commissioner's list of disabling impairments, Appendix 1, Subpart P, Regulations No. 4. Her allegations of limitations are not fully credible. In addition, plaintiff's cognitive disorder NOS does not precisely satisfy the diagnostic criteria of Part A and does not meet the Part B criteria.
As to RFC, plaintiff can
lift a maximum of 20 pounds with her right upper extremity and 10 pounds with her left upper extremity. Occasional lifting does not increase her ability to lift. She has no limitations with standing, walking, and sitting. She is limited with pushing and pulling with her upper extremities to the weights described for lifting. She can occasionally climb ramps and stairs, but cannot climb ropes, scaffolds or ladders. She can occasionally balance, kneel, crouch, crawl, and stoop. Her use of her left upper extremity is slightly decreased for reaching, handling, fingering, and feeling due to slight clumsiness with rapid, alternating movements with the left upper extremity. [She] would need [a] low stress work environment and a job that *1148 did not require her to meet strict industrial standards for pace or productivity, such as would be required in assembly-line jobs, wherein failure to keep pace would have an immediate impact on other work.
(Tr. 17-18 (Finding 7).)
Plaintiff's "past relevant work as a parking lot cashier, cashier in a convenience store, and retail shoe sales person do not require the performance of work-related activities precluded by the above limitations." (Finding 8.) Moreover, she "is able to perform her past relevant work as a parking lot cashier, cashier in a convenience store, and retail shoe sales person." (Finding 9.) In addition to her past relevant work, in view of her age, limited education, work experience, and RFC, jobs existing in significant numbers in the local and national economies that plaintiff can perform include office cleaner and motel/hotel maid, with at least 3,000 of each in the St. Louis metropolitan area. (Tr. 18.)
In reaching this determination, the ALJ explained that, insofar as the GAF of 50 assigned by Dr. Goldman could be construed as an opinion that plaintiff was disabled, the opinion would be given no weight, because it was not well supported by medically acceptable clinical and laboratory diagnostic techniques and was inconsistent with the preponderance of medical evidence in the record. The ALJ went on to provide examples of such inconsistencies. (Tr. 16.)
E. Plaintiff's arguments
Plaintiff makes numerous arguments in her brief. First, she argues that substantial evidence does not support the ALJ's decision that she could return to past work as a parking lot cashier, cashier in a convenience store, and retail shoe salesperson. Additionally, she argues that the VE's testimony did not constitute substantial evidence because the record does not clearly indicate what the specific hypothetical question posed to the VE was, nor did any of the hypothetical questions encompass all of her relevant impairments. Moreover, she suggests that, because Dr. Goldman concluded that she tested with borderline intelligence, the ALJ should have included borderline intellectual functioning in the hypothetical presented to the VE. Finally, she criticizes the ALJ's reason for giving no weight to Dr. Goldman's opinion. (Doc. 16 at 8-10.)

II. DISCUSSION
A. General legal framework
The court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir.2002). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court must consider evidence that detracts from, as well as supports, the Commissioner's decision. See Brosnahan v. Barnhart, 336 F.3d 671, 675 (8th Cir.2003). So long as substantial evidence supports the final decision, the court may not reverse it merely because opposing substantial evidence exists in the record or because the court would have decided the case differently. See Krogmeier, 294 F.3d at 1022.
To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment which would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability *1149 in general. See 20 C.F.R. §§ 404.1520, 416.920[9]; see also Bowen v. Yuckert, 482 U.S. 137, 140-41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir.2003).
Step Four, one of the determinations of which are at issue in this case, asks whether the claimant's severe impairment or combination of impairments prevents her from doing work she has performed in the past. 20 C.F.R. §§ 404.1520(e), 416.920(e). "A job is past relevant work if it was `done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity.'" Moad v. Massanari, 260 F.3d 887, 891 (8th Cir.2001) (quoting 20 C.F.R. § 404.1565(a)). If a claimant's monthly earnings at a job between January 1990 and June 1999 averaged more than $500, such earnings will ordinarily show that the claimant engaged in substantial gainful activity, whereas monthly earnings averaging less than $300 during those years will ordinarily show that the claimant has not engaged in substantial gainful activity. See 20 C.F.R. § 404.1574(b)(2)(i), (3).
If a claimant is able to perform her previous work, she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). To determine whether a claimant can perform her past relevant work, the ALJ assesses and makes a finding about the claimant's RFC based on all the medical and other evidence in the case record. 20 C.F.R. § 404.1520(e); see 20 C.F.R. § 404.1545(a)(1) (RFC is the most a claimant can do despite her limitations). Moreover,
[w]hen evaluating whether a claimant can return to past work, the ALJ: must specifically set forth the claimant's limitations, both physical and mental, and determine how those limitations affect the claimant's [RFC]. The ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work. Then, the ALJ should compare the claimant's [RFC] capacity with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks.
Ingram v. Chater, 107 F.3d 598, 604 (8th Cir.1997) (citing Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir.1991)).
If the claimant is able to perform her previous work, she is not disabled. 20 C.F.R. §§ 404.1520(f), 416.920(f). If she cannot perform her past work the burden shifts and, at Step Five, the Commissioner must show that the impairment or combination of impairments does not prevent her from making an adjustment to any other work. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1); see Singh v. Apfel, 222 F.3d 448, 451 (8th Cir.2000) (burden). If she can make such an adjustment, then she is not disabled. 20 C.F.R. §§ 404.1520(g)(1), 416.920(g)(1).
The Commissioner can meet this Step 5 burden through one of two means: (1) if a claimant's impairments are exertional, the Commissioner may refer to the Medical-Vocational Guidelines or "Grids," or (2) if the claimant has nonexertional impairments, which make use of the Grids inappropriate (as in this case), VE testimony is required. Id. VE testimony constitutes substantial evidence when based on a properly phrased hypothetical question, i.e., a hypothetical "must include all impairments that are supported by substantial evidence." Tucker v. Barnhart, 363 F.3d 781, 784 (8th Cir.2004).
*1150 B. Past relevant work
Substantial evidence does not support Findings 8 and 9 concerning past relevant work. Specifically, the evidence does not show (and defendant does not dispute (Doc. 19 at 5)) that plaintiff had any past relevant work as a parking-lot cashier. It also does not show that she had past relevant work as a cashier at a convenience store. Although plaintiff worked as a cashier at Walgreens, she only earned $109.25 there. See 20 C.F.R. § 404.1574(b)(3). Moreover, the ALJ failed to "make explicit findings regarding the actual physical and mental demands of [that] work." See Ingram, 107 F.3d at 604. Although plaintiff worked as a cashier at Wal-Mart, Wal-Mart is not a convenience store. See Webster's Ninth New Collegiate Dictionary 286 (9th ed.1986) (defining "convenience store" as "a small often franchised market that is open long hours"). Even if it were a convenience store, the amount of weight plaintiff indicated that she lifted at that job, e.g., 50-pound bags of dog food, far exceeds the 20-pound maximum contained in the ALJ's RFC determination.
In addition, the court also cannot say, based on the record, whether plaintiff's shoe salesperson job constituted past relevant work. Although plaintiff's FICA earnings statement indicates that she earned $2237.55 at Youthful Shoes during 1996, it does not indicate how long she worked there and, at the hearing, the ALJ's questions to plaintiff about that job did not elicit details regarding duration or the demands of such work. See Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.2000) ("it is the duty of the ALJ to fully and fairly develop the record, even when ... the claimant is represented by counsel"). Thus, the ALJ could not have made, and did not make, explicit findings regarding the actual physical and mental demands of plaintiff's shoe sales job.
C. Vocational evidence and VE testimony
Although the August 29, 2003 hearing transcript is difficult to follow, it does provide substantial evidence to support the ALJ's determination that at least 3,000 office cleaner and motel/hotel maid positions exist in the St. Louis metropolitan area that plaintiff can perform given her age, education, work experience, and RFC. See Tucker, 363 F.3d at 784. While the interrogatories to which the VE responded on May 16, 2002, did not include the requirements for the work to be low stress and less than industrial requirements for pace and production, the VE confirmed that those additional requirements would not change his opinion expressed regarding the original interrogatories.
Moreover, the fact that the ALJ did not adopt the hypothetical offered by plaintiff's counsel, which relied on Dr. Goldman's report, does not warrant remand, because substantial evidence supports the ALJ's not adopting that doctor's opinion. As the ALJ explained, Dr. Goldman's recommendation that plaintiff undergo evaluation for work as a cashier or a receptionist is not indicative of the severity of symptoms reflected in the GAF of 50 and is inconsistent with other medical evidence of record. For example, on June 16, 2000, Dr. Glick indicated that plaintiff's stroke symptoms had almost completely resolved with therapy; on July 15, 2000, examining physician Clerc believed plaintiff had a good chance of seeking gainful employment; and on March 15, 2002, Dr. Turpin also concluded that plaintiff should be able to perform work-related activities.[10]
*1151 The final decision of the Commissioner is affirmed.
NOTES
[1] In the "dates" column of a work-history form, plaintiff wrote that the dates were unknown or that she had "lost dates from stroke." (Tr. 95.)
[2] She wrote "unknown dates/memory lost from stroke," in the column of the work background form that asked for the approximate dates of employment. (Id.)
[3] "[D]ysarthria" is defined, inter alia, as "a disturbance of articulation due to ... brain injury." Stedman's Medical Dictionary 475 (25th ed.1990).
[4] "[D]ysarthria" is defined as a disturbance of speech. Id. at 474.
[5] The corona radiata is "a fan-shaped fiber mass on the white matter of the cerebral cortex." Id. at 354.
[6] "[A]taxia" is defined as "an inability to coordinate the muscles in the execution of voluntary movement." Id. at 147.
[7] At one point the ALJ stated, "Well, I have to tell you[,] I'm still confused." "I'm slightly confused too," replied plaintiff's counsel, to which the VE replied, "Don't feel alone." (Tr. 365.)
[8] The court has identified parenthetically some of the ALJ's enumerated findings.
[9] These Regulations were amended, effective September 25, 2003. See Clarification of Rules Involving Residual Functional Capacity Assessments; Clarification of Use of Vocational Experts and Other Sources at Step 4 of the Sequential Evaluation Process; Incorporation of "Special Profile" Into Regulations, 68 Fed.Reg. 51,153, 51,163, 55,164 (Aug. 26, 2003).
[10] Plaintiff accurately takes aim at the ALJ's determination that Dr. Goldman's opinion was not well supported by medically acceptable clinical and laboratory diagnostic techniques, but plaintiff ignores the second aspect of the relevant analysis. See Dixon v. Barnhart, 353 F.3d 602, 606 (8th Cir.2003) ("medical opinions must be supported by acceptable medical evidence and must not be inconsistent with other evidence on the record as a whole" (emphasis added)).